COURT OF APPEALS OF WEST VIRGINIA.    85

July Term,        Osburn *et al.* vs. Staley *et al.*        1871

BERKSHIRE, P., Dissentient.

# LOGAN OSBURN *et al. vs.* JOHN D. STALEY *et al.*

July Term, 1871.

1. Parties who are taxpayers and citizens of a county, and who own real estate in a town from which it is claimed other parties are about to illegally remove the county seat by carrying away the records, books, documents, &c., under a pretended act of the legislature, to the great damage, expense and injury of the citizens of the county generally, and the parties plaintiff in particular, can maintain a suit by injunction against the parties so endeavoring to remove.

2. By the 15th section of chapter 7 of the Code, 1868, all acts done by any person by authority of any office, are valid. Such would be the law without the statute.

3. The constitution of West Virginia requires each branch of the legislature to keep a journal, and provides that on the passage of every bill the vote shall be taken by yeas and nays, and be entered on the journal, and no bill shall be passed by either branch without an affirmative vote of a majority of the members elected thereto; and on a question touching the validity of an act, this court can look beyond the authentication of the act, to the journal of either branch, to see if the bill passed by the required number of votes.

4. While the legislature is governed by the *spirit* of the constitution, the courts cannot declare an act of the legislature invalid unless its invalidity is placed beyond a reasonable doubt. A reasonable doubt must be solved in favor of the legislative action, and the act be sustained. The courts must be guided by the express words of the constitution, and not by its supposed spirit. Whenever an act of the legislature can be so construed as to avoid conflict with the constitution and give it force of law, such construction will be adopted by the courts.

5. It is not clear beyond a "reasonable doubt," that the words "members elected," in the constitution of this State, in the section providing that "no bill shall be passed by either branch (of the legislature) without an affirmative vote of a majority of the *members elected* thereto," can only refer to persons elected at the last preceding elections, although they may have ceased to be members at the time the vote is taken on the passage of the bill; and a resonable doubt as to this, is sufficient to sustain the validity of the act under consideration.*

*The act under consideration was passed by the affirmative vote of eleven senators, in a body which consisted, when full, of twenty-two members; one member had resigned after the opening of the session at which the act was passed.

6. To avoid conflict with the constitution, and to give the act the force of law, the construction that members elected, occurring as before noted, refers to those who were members at the time the vote was taken, should be adopted to sustain the validity of the act.

John D. Staley, David Billmyer, William Rightstine and others, citizens, taxpayers and residents of Jefferson county, filed a bill of injunction in the circuit court of that county, at April rules, 1871, against Logan Osburn, James H. Moore, John E. Cockerell, David Howell, senior, and John J. Lock.

The bill alleged that the county seat of that county was legally located at Shepherdstown, by act of the legislature. That in pursuance of the act, large sums of money had been collected by taxation, and expended in the erection of a court house, jail and other county buildings at that place. That by a provision of the Code of West Virginia, chap. 39, sec. 29, it was provided that the county seat of any county might be removed by a vote of the people. That the defendants claimed to be authorized to remove the books, records and documents of the county from Shepherdstown to Charlestown, in that county, by virtue of an act of the legislature, passed February 23d, 1871. That there were in the State of West Virginia, eleven senatorial districts, and that at the election before the opening of the legislature at which the last mentioned act was passed, parties were elected from all the senatorial districts, so that at the beginning of the session of the legislature, the full number of senators provided by the constitution were chosen by the people, making in all twenty-two senators, and actually sworn in. That on the passage of the bill appointing the defendants commissioners for the purpose of removal of the records, &c., but *eleven* senators voted *aye*, on its passage, when by sec. 37, art. IV. of the Constitution, it was provided that no bill should be passed by either branch of the legislature without an affirmative vote of a majority of the members elected thereto, as appeared by the certificate of the clerk of the senate, filed with the bill. That, therefore, the act was void, and the removal in violation of law, and would greatly increase the burdens of taxation.

The aid of the court was invoked to enjoin the defendants from making the removal, which it was alleged they were about to do, to the great injury of the public interests of the county.

The bill had been previously presented to the judge of the fifth judicial circuit, which did not embrace the county of Jefferson, and had been by him refused, on the 11th of March, 1871. Subsequently, on the 15th of March, it was granted by one of the judges of this court.

An amended bill was filed, which, in addition to the matter set up in the original, alleged that four of the plaintiffs were owners of real estate in the town of Shepherdstown, and that their individual interests would be materially affected and injured if the removal of the county seat were effected, and that they had suits in the circuit court of the county, and their individual interests and convenience would also be materially affected by the removal.

The defendants answered the bill, admitting the acts of the legislature referred to in the bill. They neither admitted nor denied the allegation concerning the number of senators who voted on the final passage of the bill, but demanded proof of it. They further answered that they were advised that no such question could be inquired into, or determined in this cause, and therefore they prayed the benefit of a demurrer to that part of the bill which sought relief upon the ground that the act of removal was passed by a less number than a constitutional majority. They also prayed the benefit of a demurrer as to the right of the plaintiffs to institute this suit, on the ground that such right was not given them by reason of their being taxpayers and citizens of the county.

The injunction was perpetuated, in vacation, on the 12th of April, 1871, by the judge of the sixth circuit, the circuit in which the county was judicially organized.

The defendants appealed to this court.

*Hunter* and *Travers* for appellants.
*Faulkner* and *Van Swearingen* for appellees.

MAXWELL, J. By the second section of an act purporting to be passed by the legislature of this State, on the 23d day of February, 1871, entitled, "An act to change the county seat of Jefferson to Charlestown, in said county," it is provided, "That the county seat of the said county of Jefferson shall caese to be at Shepherdstown, in said county, thirty days

from and after the passage of this act, and from and after that date be located at Charlestown, in said county." The third section of the said act provides that Logan Osburn, James H. Moore, John E. Cockerell, David Howell, Sr., and John J. Lock be appointed commissioners to carry out the purposes of the act, by causing the public records to be removed from Shepherdstown to Charlestown, and by causing to be procured at Charlestown, rooms suitable to contain the records and to be used as offices by the county officers. The said commissioners were required to do certain other things not necessary to be mentioned. When the said commissioners were about to proceed to carry into effect the provisions of the act, John D. Staley and others, the appellees here, citizens, taxpayers and residents of Jefferson county, applied to the judge of the fifth judicial circuit for an injunction to enjoin and restrain them from performing their supposed duty under the said act. The said judge refused to award the injunction, and application was then made to one of the judges of this court, who granted it, and the cause was sent to the circuit court of Jefferson county to be proceeded in. The defendants, upon being summoned, answered the bill and moved the judge of the circuit court of Jefferson county, in vacation, to dissolve the injunction, which he refused to do, and it is from this order the case comes here on appeal to be reviewed.

The first cause of error assigned is, that the complainants are private persons, and not acting in any official capacity, and therefore could not enjoin the defendants.

The bill, and amended bill, filed after the injunction was allowed, show that certain of the parties named have special interests to be affected by the removal of the county seat, and also show that the bill is filed in behalf of the complainants and others in the county of Jefferson having like interests, which is sufficient to allow them to maintain the suit. Story's Equity Pl., § 114. *Lusher* vs. *Scites*, 4 W. Va., 11; *Kuhn* vs. *The Board of Education of Wellsburg*, 4 W. Va., 490.

The second cause assigned as error is, that the injunction was improperly allowed by a judge of this court, because it is claimed that the person who endorsed the refusal of the injunction as judge of the fifth circuit, was not at the time a judge of the said circuit.

It is well known that the person who endorsed his refusal to allow the injunction was at that time, and still is, the acting judge of the fifth circuit, and the 15th section of chapter 7 of the Code, p. 73, provides that all acts done by any person by authority of any office shall be valid, and such would indeed be the law without this act of the legislature.

The third ground of error assigned is, that " the court cannot, for the purpose of impeaching a statute, go behind the record to inquire into the regularity of the proceedings of the legislature in passing such act. The enrolled bill, therefore, authenticated according to the form prescribed by law, is the ultimate and conclusive proof of the legislative will. The journals of the legislative houses are not competent evidence to show that a copy of a statute authenticated in the manner above stated, does not contain the whole law as in point of fact it was enacted. The validity of such a statute cannot be impeached or contradicted by the journals of the legislature."

The proposition intended to be propounded by this formula is, that this court cannot go behind the bill as enrolled by the clerk of the house of delegates, and signed by the president of the senate and speaker of the house of delegates, to look at the journal of the senate to see if the bill was passed by the number of votes required by the constitution. The constitution, art. IV., sec. 37, provides that : " On the passage of every bill, the vote shall be taken by yeas and nays, and be entered on the journal; and no bill shall be passed by either branch without an affirmative vote of a majority of the members elected thereto." Section 39 provides : " Each branch shall keep a journal of its proceedings, and cause the same to be published from time to time." What is the evidence of the existence of a statute, to which the courts most look, is a question which has been often before the courts, and very much discussed. The oldest case before us at this time is that of *The King* vs. *Arundel*, reported in Hobart, p. 109. The first point in this case was to get rid of an act of parliament which had the " king's assent unto it," and " whereunto the great seal is set as the course is in private acts," because it was not the act of both houses, the lords and commons, as it ought to be. The court examined the journals, and could

90 COURT OF APPEALS OF WEST VIRGINIA.

July Term,       Osburn *et al. vs. Staley et al.*       1871

not find that the bill as amended, and to which the great seal was attached, had been passed by both houses, and proceeded to state: "But now supposing that the journal were every way full and perfect, yet it hath no power to satisfy, destroy or weaken the act, which being a high record must be tried only by itself *teste meipso.* Now, journals are no records, but remembrances for forms of proceedings to the record; they are not of necessity, neither have they always been. They are like the dockets of the pronotaries, or the particular to the king's patents." And so it was held that the courts could not go behind the authentication of the act, and it is believed that this case has ruled the English courts from that time to the present. The rule established in England has been followed by the courts of last resort in several of the United States, as will appear from the following cases: *Eld* vs. *Gorham*, 20 Connecticut Reports, p. 8; *Green* vs. *Weller*, 32 Mississippi Reports, p. 650; *Duncombe* vs. *Prindle*, 12 Iowa Reports, p. 1; *The State* vs. *Young*, 32 New Jersey Law Reports, p. 29; *Speer* vs. *Plank Road Co.*, 22 Penna. State Reports, p. 376; *Evans* vs. *Browne*, 30 Indiana Rep., 514. But in none of these cases does it appear that the constitution of the State in which they are decided requires the vote on the passage of a bill to be taken by yeas and nays, and entered on the journal, and requiring a certain number of votes to pass a bill. In the case of *Purdy* vs. *The People*, 4 Hill, 348, it was decided by the court of errors of New York that the journals kept by the two houses of the legislature, may be resorted to in ascertaining whether an act was passed by a vote of two-thirds. It was decided by the supreme court of Michigan, in the case of *The People* vs. *Mahoney*, 13 Michigan Rep., 481, that as the courts are bound judicially to take notice of what the law is, it is their right, as well as duty, to take notice not only of the printed statute books, but also of the journals of the two houses, to enable them to determine whether all the constitutional requisites to the validity of a statute have been complied with. The same doctrine is held by the justices of the supreme court of New Hampshire, reported in 35 New Hampshire Rep., 579. The case of *Spangler* vs. *Jacoby*, 14 Illinois Rep., 297, is more nearly in point than any of the cases found. The constitution of Illinois provides that: "Each house shall

keep a journal of its proceedings." "On the final passage of all bills, the vote shall be by ayes and noes, and shall be entered on the journal; and no bill shall become a law without the concurrence of a majority of all the members elect in each house." The court says: "A majority of all the members elected to either branch of the general assembly must concur in the final passage of a bill; this is indispensable to its becoming a law; without it, the act has no more force than the paper upon which it is written. The vote must be taken by ayes and noes. The constitution prescribes this as the test by which to determine whether the requisite number of members vote in the affirmative. The vote must also be entered on the journal. The office of the journal is to record the proceedings of the house and authenticate and preserve the same. It must appear on the face of the journal, that the bill passed by a constitutional majority. These directions are all clearly imperative. They are expressly enjoined by the fundamental law, and cannot be dispensed with by the legislature."

This case was reviewed and affirmed in the case of *The People* vs. *Starne*, Ill. Rep., p. 121. It was held by the supreme court of California, in the case of *Fowler* vs. *Pierce*, 2 California Rep., p. 165, that the court may go behind the record evidence of a statute and inquire whether it was passed or approved in accordance with the constitution. The court say: "We are called upon to decide whether the courts of the land, to whom belong the guardianship and exposition of the laws and constitution, have power to go behind the act itself to inquire whether the legislature, or the executive, as a component part of the legislative power, have, in passing or approving such act, violated or disregarded the mode pointed out by the organic law of the land. * * * If such matters cannot be inquired into, the wholesome restrictions which the constitution imposes on legislative and executive action, become a dead letter, and courts would be compelled to administer laws made in violation of private and public rights, without power to interpose." The supreme court of the United States had this question in the case of *Gardner* vs. *The Collector*, 6 Wallace, p. 499, and the following language is found in the opinion of the court in that case: "How can it be held that

the judges, upon whom is imposed the burden of deciding
what the legislative body has done, when it is in dispute, are
debarred from resorting to the written record which that body
makes of its proceedings, in regard to any particular statute.
*   *   * We are of opinion, therefore, on principle as
well as authority, that whenever a question arises in a court
of law of the existence of a statute, or of the time when a
statute took effect, or of the precise terms of a statute, the
judges who are called upon to decide it have a right to resort
to any source of information which in its nature is capable of
conveying to the judicial mind a clear and satisfactory an-
swer to such question; always seeking first for that which in
its nature is most appropriate, unless the positive law has
enacted a different rule." Cooley, in his work on Constitu-
tional Limitations, p. 135, states what he understands to be
the law in this country, as follows: "Each house keeps a
journal of its proceedings, which is a public record, and of
which the courts are at liberty to take judicial notice. If it
should appear from these journals that any act did not receive
the requisite majority, or that in respect to it the legislature
did not follow any requirement of the constitution, or that in
any other respect the act was not constitutionally adopted,
the courts may act upon this evidence, and adjudge the statute
void. But whenever it is acting in the apparent performance
of legal functions, every reasonable presumption is to be made
in favor of the action of a legislative body ; it will not be pre-
sumed in any case, from the mere silence of the journal, that
either house has exceeded its authority, or disregarded a con-
stitutional requirement in the passage of legislative acts,
unless where the constitution has expressly required the jour-
nals to show the action taken, as, for instance, where it re-
quires the yeas and nays to be entered." I conclude from
these authorities, together with others examined and not
named here, that as the constitution requires each branch of
the legislature to keep a journal, and provides that on the
passage of every bill the vote shall be taken by yeas and nays,
and be entered in the journal, and that no bill shall be passed
by either branch without an affirmative vote of a majority of
the members elected thereto, this court should look beyond
the authentication of the act to the journal of the senate to

see if the bill was passed by the required number of votes. It was insisted in the argument of the case, that such a conclusion as this would be inconsistent with the case of *Lusher* vs. *Scites*, decided by this court at a former term, and reported in 4 W. Va. R., p. 11. That case was in no respect like the present one. In the case of *Lusher* vs. *Scites*, the passage of the acts by both branches of the legislature by the required number of votes was not questioned, and the only question was as to the effect of the acts in question when passed. It was held in that case that when an act is passed by both branches of the legislature by the number of votes required by the constitution, the courts cannot go behind the passage of the act for any purpose whatever, and that decision rests upon abundant authority, well known to every lawyer of intelligence who has examined the subject.

The fourth and last point made by the counsel for the appellant is, that only a majority of the members remaining after the resignation of one member, is required to pass a bill. The senate, when full, consists of twenty-two members, and it is conceded that at the commencement of the session of the legislature, at which the bill in question was passed, this branch was full. The pleadings in the cause are indefinite and uncertain, but it sufficiently appears from the pleadings and the admissions of the parties, that at the time the vote was taken the journal will show that one member of the senate had resigned his seat, and that only eleven senators voted aye on the passage of the bill. The point of difference between counsel is, the construction to be given to the provision of the constitution : "No bill shall be passed by either branch without an affirmative vote of a majority of the members elected thereto." Counsel for appellees contend that "members elected" means persons elected as members at the last preceding elections, whether members at the time the vote is taken or not; while the counsel for appellants contend that "members elected" means members who would be entitled to vote at the time the vote is taken on the passage of the bill, if present. It seems that when the vote was taken on the passage of the bill, the president of the senate ruled that eleven yeas were sufficient to pass it. An appeal was taken from this decision of the chair to the senate, and the chair

sustained. The true theory of representative government is that a majority of the representatives of all the people to be bound by any law, should assent to it, and it cannot be doubted but that the people, when they put this provision in the constitution, intended to secure themselves against the passage of any law to which a majority of all the people should not consent. The representatives of the people should be governed by the *spirit* of the constitution, and in doubtful cases should decline the exercise of power. For these reasons, with all respect, it was the duty of the senate to have declared the bill not passed. But the senate having declared the bill passed, this court is called upon to decide whether or not it can stand as a valid law. While the legislature is governed by the *spirit* of the constitution, the courts cannot declare an act of the legislature invalid unless its invalidity is placed, in their judgment, beyond reasonable doubt. A reasonable doubt must be solved in favor of the legislative action, and the act be sustained. The courts must be guided by the express words of the constitution, and not by its supposed spirit. Whenever an act of the legislature can be so construed and applied as to avoid conflict with the constitution, and give it force of law, such construction will be adopted by the courts. Cooley's Const. Lim., p. 182–3–4–5; *Cooper* vs. *Telfair*, 4 Dallas, 18; *Wellington Petitioner*, 16 Pickering, 95; *The People* vs. *Fisher*, 24 Wendell, 220; *Sears* vs. *Cottrell*, 5 Michigan Rep., 251; *Tyler* vs. *The People*, 8 Idem, 320; *City of Baltimore* vs. *The State*, 15 Maryland. Rep., 376. In the light of these well established rules, what is the meaning which should be given by the courts to the words, "members elected?" If they can be held to mean persons who are members at the time the vote is taken, then the bill was passed by a sufficient number of votes. The words appear to mean that a person must be a "member," as well as "elected;" and if a senator resigns his seat, and his resignation is accepted, is he still a "member?" It is certainly not clear beyond a reasonable doubt, that the words "members elected" can only refer to persons elected at the last preceding elections, although they may have ceased to be members at the time the vote is taken on the passage of a bill; and a reasonable doubt as to this is sufficient to sustain the validity of the act in question. And again, according to

another rule of construction stated, that whenever an act of the legislature can be so construed as to avoid conflict with the constitution, and give it force of law, such construction will be adopted by the courts.   The construction that "members elected" refers to those who were members at the time the vote was taken, should be adopted to sustain the validity of the act.   Upon the whole, no good cause appears to require the court to declare that the act is unconstitutional and invalid.   The decree or order complained of will, therefore, have to be reversed, the injunction dissolved and the bill and amended bill dismissed.

Moore, J., concurred in the conclusion of Maxwell, J.

Berkshire, P., dissented.

INJUNCTION DISSOLVED.