## Wytheville.

### WISE v. BIGGER, CLERK, & ALS.

August 7, 1884.

1. JURISDICTION—*Mandamus.*—This court hath jurisdiction to declare what acts of the general assembly are and what are not laws, and to award a *mandamus* to compel the keeper of the rolls to strike from the rolls and the superintendent of the public printing to omit from the acts of the assembly any act which, in the judgment of this court, is not a law, upon the petition of a citizen of this commonwealth.

2. MANDAMUS—*When it Lies—When Not.*—This writ lies to compel performance of duties purely ministerial, but does not lie to compel performance of acts necessarily calling for the exercise of discretion on the part of the officer on whom they are incumbent.

3. LEGISLATURE—*Journals.*—The journals of the legislature are records of its proceedings, importing absolute verity. When they show that an act has been passed in a regular manner, such showing cannot be impeached.

4. IDEM—*Rules, &c.*—Each house of the general assembly is vested with the power of making rules for its own government, to grant leave of absence, excuse members from voting, and recognize what are called *pairs.*

5. IDEM—*Discretionary Powers.*—The laying off and defining the congressional districts is the exercise of a political and discretionary power of the legislature.

Upon petition of John S. Wise for a writ of *mandamus* to compel John Bell Bigger, clerk of the house of delegates and keeper of the rolls of Virginia, to strike from the rolls the act entitled, " An act to apportion the representation of the state of Virginia in the congress of the United States," in force on 22d

day of February, 1884, and to compel Rush U. Derr, superintendent of public printing, to omit said act from the acts of the general assembly for 1883–84. Opinion states the case.

*R. T. Hubard*, for the petitioner.

*John W. Daniel*, *W. R. Staples*, for the respondents.

FAUNTLEROY, J., delivered the opinion of the court:

Upon the petition of John S. Wise, a citizen of Richmond, Virginia, representing that he is a qualified voter therein, and now representative in congress from the state of Virginia at large, and, as such, interested in having the proper representation in congress to which the state is entitled, secured to him, in common with other citizens, as also his right to vote for a representative at large from said state, or himself to be voted for as a candidate for such office; that he is aggrieved and injured, and his rights aforesaid endangered by the wrongful enrollment among the laws of Virginia, by J. Bell Bigger, clerk of the house of delegates and keeper of the rolls of Virginia, and his refusal to exclude or strike from the said rolls, a certain pretended act of assembly, entitled "an act to apportion the representation of the state of Virginia in the congress of the United States," and alleged to be in force on the 22d day of February, 1884, and which was designated on the senate journal and known as "senate bill No. 321;" and also by the wrongful refusal of R. U. Derr, superintendent of public printing, to omit said pretended act from the acts of assembly, and his proceeding to publish and distribute the same, as "chapter 147" of the "Acts of Assembly of 1883–1884," with the title aforesaid; it was ordered by this court, on 22d July, 1884, that the said John Bell Bigger, clerk of the house of delegates, and keeper of the rolls of Virginia, and the said R. U. Derr, superintendent of public printing, after being served with a copy of

this order, appear here, at 12 m. on the 31st day of July, 1884, and show cause, if any they can, wherefore the common-wealth's writ of *mandamus* should not be awarded the said John S. Wise, commanding the said John Bell Bigger, clerk of the house of delegates and keeper of the rolls of Virginia, to strike from the rolls the act entitled, "an act to apportion the repre-sentation of the state of Virginia in the congress of the United States," designated as in force on the 22d day of February, 1884 ; and also commanding the said R. U. Derr, superintendent of public printing, to omit said act from the acts of the general assembly for 1883–1884, which he is required by law to publish and distribute.

The petition alleges that said act having gone on the rolls and being printed and distributed as one of the laws of the state, the officers of the state, including judges and commissioners of election, will be bound to respect it and conform to it, unless it be declared void by this court ; that whereas heretofore the peo-ple have elected nine representatives in congress by districts, and one for the state at large, the bill aforesaid provides that all ten representatives shall be chosen by the respective electors of the ten districts described therein, and in the present uncertainty the state is in danger of losing her representation entirely in the forty-ninth congress ; for if the election takes place pursuant to the provisions of said bill, and the same be not a law, then the state will have no legally elected and duly accredited representatives in the forty-ninth congress ; that the said senate bill, No. 321, never in fact became a law, for that there is no sufficient evi-dence that the said bill ever passed the senate (the house in which it originated) by such a majority over the governor's veto as the constitution requires ; that, in point of fact, it never re-ceived the affirmative vote of two-thirds of the senators present when the question was put, " shall the bill pass, notwithstanding the objections of the governor ? " That there were, at the time, present in the senate chamber not less than twenty-nine senators, and that only nineteen of these voted "aye" on such passage of

the said bill. The petitioner exhibits the senate journal of February 22, 1884, and the rules of that body, and avers that the senate had an official stenographic reporter, whose reports were recognized by the senate as official, and which reports for that day will show that Senator Williams C. Wickham was present and not voting on the said passage of the said bill, he declaring that he regarded the said bill as unconstitutional and could not support it under any circumstances; and the petition avers that he was so present, and was not, and could not be, lawfully excused from voting, that, in fact, the senate journal itself discloses the fact that the said senator was present at that time, although it does not in terms say so. The petition alleges and insists that it was not in the lawful power of the senate to so recognize "*pairs*" of individual senators as to convert a majority vote into a two-thirds vote, to pass the said bill over the executive veto, and prays leave to prove by the stenographic report and other evidence, the facts alleged in the petition. The petition further alleges that the said pretended act is null and void, on the further ground of repugnance to the 12th and 13th sections of article V, of the constitution of Virginia, because the districts into which the state is thereby divided, are not, or as near as may be, equal in "population," "compact," and composed of "contiguous counties, cities, and towns."

The respondents appeared on the day named in the rule and demurred to the petition and to the rule, and answered the same.

Respondent Derr adopted the answer of his co-respondent, Bigger, as a part of his answer, and further says, that in pursuance of his official duties as superintendent of public printing, he had printed and distributed the acts of the general assembly of Virginia for the session 1883–84, before the rule in this case was served upon him, and that among said acts so printed and distributed by him, is the act in the petition of the relator referred to and entitled an "act to apportion the representation of the state of Virginia in the congress of the United States;"

and that, having so printed and distributed the said acts, as he was required by law to do, he has no .further official control over them, and that it would be out of his power to obey a peremptory *mandamus,* if one were awarded by this court, as prayed for by the relator against him.    To the aforesaid return of the respondents to the rule *nisi,* the petitioner joined in the demurrer, and replied and demurred to the answers.

The demurrer of respondents admits the facts set forth in the petition, and the answers controvert the material facts and the questions of law arising upon the facts set forth in the petition and denied in the answers.

Upon these pleadings we have first to determine the question of the jurisdiction or power of this court in the premises, and the right of the .relator to the extraordinary remedy which he seeks.

We have no doubt of the jurisdiction of this court to hear and determine the questions arising upon this application.

At a very early day, in the leading case of *Marbury* v. *Madison,* 1 Cranch, 172–3, it was determined by the supreme court of the United States that the inferior court of the United States had jurisdiction to hear and determine, upon petition for *mandamus,* the question whether the president of the United States had, or had not, exercised in conformity with the constitution of the United States, the executive function of appointment of justices of the peace for the District of Columbia, which was vested in the executive department exclusively by the constitution of the United States.

And, from that day to this, it has been the indisputable and clear function of the courts, federal and state, to pass upon the constitutionality of legislative acts; and the grounds of this jurisdiction, as well as the duty of its fearless exercise, are admirably stated by Chief Justice Marshall, at pages 170 to 180, 1 Cranch's Reports, before cited; and *vide* 1 Va. Cases, 20.

That the court must take notice of compliance, or non-compliance, with the constitution, in the mode and manner of en-

acting laws, as well as in the objects and provisions of the proposed laws, is a settled question. In *Wolfe et als.* v. *McCaull, Clerk, &c.,* 76 Va., Judge Christian, in delivering the opinion of this court, says: "To enact laws or to declare what the law shall be, is legislative power ; to interpret law—to declare what law *is* or *has been*—is judicial power. The power to declare what is the law of the state, is delegated to the courts. The power to declare what the law is, of necessity involves the power to declare what acts of the legislature *are*, and what acts of the legislature *are not laws.*"

In *Gardner* v. *The Collector,* 6 Wall. 499, the question of the power of a court of law to determine *when* an act of congress became a law, or as to the *existence* of a law, was affirmed by the supreme court of the United States. (See also *Town of South Ottowa* v. *Perkins,* 94 U. S. 260; Cooley's Com. Lim. 94, side page).

The claim of right on which the relator bases his application for the exercise of the coercive power of this court, in this case, is that, as a citizen of Virginia, he is entitled, in common with other citizens, to have proper representation in congress from the state, also to vote for a representative from the state at large, as well as to become a candidate for the state at large. This right, he seeks to have secured to him by the *mandamus,* asked for in his petition.

High on Extraordinary Legal Remedies, sec. 431, says: "As regards the degree of interest on the part of the relator, requisite to make him a proper party, on whose information the proceedings may be instituted, a distinction is taken between cases where the extraordinary aid of *mandamus* is invoked, merely for the purpose of enforcing or protecting a private right, unconnected with the public interest, and those cases where the purpose of the application is the enforcement of a purely public right, where the people at large are the real party in interest. And while the authorities are somewhat conflicting, yet the decided weight of authority supports the proposition, that,

where the relief is sought merely for the protection of private rights, the relator must show some personal or special interest in the subject matter, since he is regarded as the real party in interest, and his rights must clearly appear. On the other hand, where the question is one of *public* right, and the object of the *mandamus* is to procure the enforcement of a public duty, the *people* are regarded as the real party, and the relator, at whose instigation the proceedings are instituted, need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen, and, as such, interested in the execution of the laws." (*County of Pike* v. *The State*, 11 Ill. 202; *City of Ottawa* v. *The People*, 48 Ill. 233; *Hamilton* v. *The State*, 3 Ind. 452; *People* v. *Collins*, 19 Wend. 56; *Hall* v. *The People*, 57 Ill. 307; *People* v. *Halsey*, 37 N. Y. 344; *State* v. *County Judge of Marshall*, 7 Iowa, 186.)

" The modern writ of *mandamus* may be defined as a command issuing from a common law court of competent jurisdiction, in the name of the state or sovereign, directed to some corporation, officer, or inferior court, requiring the performance of a particular duty therein specified, which duty results from the official station of the party to whom the writ is directed, or from operation of law." (See High on Ex. Legal Rem. § 1.) " Stated in general terms, the principle is, that *mandamus* will lie to compel the performance of duties purely ministerial in their nature, and so clear and specific that no element of discretion is left in their performance, but that as to all acts or duties necessarily calling for the exercise of judgment and discretion on the part of the officer or body at whose hands their performance is required, *mandamus* will not lie. The application of the rule is universal, and its illustrations are as multiform as are applications for the aid of this extraordinary remedy. It applies with especial force to cases where the aid of *mandamus* is sought against inferior courts or judges, public officers, municipal authorities, and corporate officers generally; and in all these cases, it is the determining principle in guiding the courts to a correct decision." High Ex. L. Rem. § 24.

"From the nature of the remedy, thus far disclosed, it is obvious that it relates only to the enforcement of duties incumbent by law upon the person or body against whom the coercive power of the court is invoked." High Ex. L. Rem. § 25.

And the same writer, after discussing the question whether it is necessary that a previous demand should be made on the officer to perform the act which is sought to be enforced, says, "it must, however, in all cases, clearly appear that the officer against whom the jurisdiction by *mandamus* is invoked, is actually in default in the performance of some act which the law specially enjoins as a duty resulting from his office." (§ 41.) And the same writer, in § 32, says, "that where the law enjoins upon a public officer the performance of a specific act or duty, obedience to the law may, in the absence of other adequate remedy, be enforced by *mandamus*. It is to be observed, however, that the writ neither creates nor confers power upon the officer to whom it is directed, but merely commands the exercise of powers already existing. It will not, therefore, lie to compel an officer to perform an act which, without the mandate of the court, would be unlawful for him to perform. And to warrant a court in granting a writ against a public officer, such a state of facts must be presented as to show that the relator has a clear right to the performance of the thing demanded, and that a corresponding duty rests upon the officer to perform that particular thing. And, where substantial doubt exists as to the duty, whose performance it is sought to coerce, or as to the right or power of the officer to perform the duty, the relief will be withheld, since the granting of the writ in such case would render the process of the court nugatory."

Now, let us apply these clear and conclusive principles laid down by High in his work on Ex. Legal Remedies as applicable to the writ of *mandamus* to the facts of this case.

The relator, John S. Wise, a citizen of Virginia, prays for a *mandamus* against John Bell Bigger, clerk of the house of delegates and keeper of the rolls of Virginia, and R. U. Derr, superintendent of public printing, to compel the said Bigger to

strike from the rolls the act of the general assembly passed February 22d, 1884, entitled an "act to apportion the representation of the state of Virginia in the congress of the United States," and to deliver up the same to be cancelled, and to compel the said Derr to omit the said bill from the published acts of the general assembly.

The act in question has already been enrolled, printed, published and distributed according to law, and the respondent, R. U. Derr, in his return to the rule *nisi*, says, that he had wholly discharged his duty in printing and distributing the acts of the general assembly for the session 1883–84, including this act. entitled an act to apportion, &c., before the rule in this case was served upon him; that he has no further official control over them, and that it would be out of his power to obey a peremptory *mandamus*, if one were awarded by this court, as prayed for by the relator against him.

It seems to be plain, indeed, that, as to this respondent, Derr, the process of the court would be "*nugatory ;*" the rule *nisi*, must, therefore, as to him be discharged and the writ denied.

The repondent, John Bell Bigger, as keeper of the rolls of Virginia, under the laws of the commonwealth (Code 1873, chap. 13, sec. 20, and chap. 14, sec. 14, pp. 184, 189), has the duty imposed upon him to " cause all the acts and joint resolutions of the general assembly to be enrolled on substantial paper, of uniform size ; and, after they shall have been examined by the committees on enrolled bills, and signed by the president of the senate and the speaker of the house of delegates, to cause the same to be bound in one volume of durable style ; and, as such keeper of the rolls of Virginia, he has custody of the acts and resolutions of the general assembly, and it is his further duty, as soon as practicable after the passage of every act or joint resolution, to prepare the same for publication, and furnish the superintendent of public printing, the manuscript, properly arranged for being printed. (Code 1873, chap. 14, sec. 14).

The said respondent Bigger, in his return to the rule *nisi*,

says, that he has discharged the duties imposed upon him by the statute, as above quoted, in respect to the act of assembly referred to in the petition of the relator, entitled an "act to apportion the representation of the state of Virginia in the congress of the United States." And respondent denies that he has made or given any "*refusal*," as charged in the petition, to exclude or strike from the rolls the said act; but that, whether called on so to do or not, it would be an usurpation on his part so to do, or to do otherwise than keep faithfully the rolls of which he is the sole legal custodian.

This court in the case of *Wolfe et als.* v. *McCaull, Clerk, &c.,* 76 Va. (1 Hansbrough), awarded its writ of peremptory *man damus* to P. H. McCaull, clerk of the house of delegates and keeper of the rolls of Virginia, commanding him to place upon the rolls and to publish with the printed acts of the general assembly an act of the general assembly, which he thought had not been lawfully passed, and which he had therefore omitted from the rolls, and the publication of the acts of the general assembly as required by law.

This might seem to be a decision by this court that the keeper of the rolls of Virginia is such an officer, to whom, on a proper case made, the peremptory mandate of the court may be properly sent. But however this may be, we do not deem it necessary to decide that question, in the proper disposition of this case, upon the facts disclosed in the record.

The question we have now to decide is as to the validity of the act of the general assembly dated February 22d, 1884, and entitled "an act to apportion the representation of the state of Virginia in the congress of the United States," and known as "senate bill No. 321."

And the point involved is not as to the *constitutionality* of the act, in its substance and effect, but whether said "senate bill, No. 321," did in fact ever pass the senate by the constitutional vote of *two-thirds* of the senators present at its passage? It is asserted in the petition of the relator that it did not; that in

fact it never became a law; that there is no sufficient evidence that the said bill ever passed the senate (the house in which it originated) by such a majority over the governor's *veto* as the constitution requires; that, in point of fact, it never received an affirmative vote of *two-thirds* of the senators present when the question was put, "Shall the bill pass notwithstanding the objections of the governor?" that there were at the time present in the senate chamber not less than *twenty-nine* senators, and that only *nineteen* of these voted "*aye*" on such passage of said bill. The petitioner exhibits the journal of the senate of February 22d, 1884, and avers that the said journal itself discloses the fact that Senator Williams C. Wickham was present and not voting on the said passage of said bill, though it does not *in terms* say so. Every one and all of these averments in the petition of the relator are squarely, explicitly and positively denied in the answer filed by respondents. And both sides exhibit the journal of the senate, and both appeal to it as a record importing absolute verity to sustain their counter assertions and their contention.

It would be, indeed, a double and doubtful oracle if this could be so, but the journal of the senate shows that the act in question originated in the senate, and, having passed that body, was sent to the house of delegates, where it also passed. It was then sent to the governor, by whom it was vetoed and returned to the senate, with his objections, when it was submitted to and considered by the senate and declared by the president of the senate to have been decided in the affirmative—nineteen *ayes* and nine *noes*. It was then sent to the house of delegates, where it is not pretended that it did not receive a full two-thirds vote. But we are told by the relator that the journal of the senate itself discloses the fact that Senator Wickham was present, "though it does not say so in terms." And it is further alleged, that the president of the senate, Mr. Hurt, was also present, and likewise Senator Twyman, and not voting; and this we are asked to *infer*, though the journal of the senate for that day "does not say so in terms."

The constitution of Virginia, article IV, § 8, provides, that "in all such cases the votes of both houses shall be determined by ayes and noes, and the names of the members voting for and against the bill or joint resolution, shall be entered on the journal of each house respectively." Thus the constitution provides the test by which the compliance with its requisitions shall be ascertained and recorded.

The constitution of West Virginia contains a provision similar to the constitution of this state. In the case of *Osborne* v. *Staley,* decided by the supreme court of that state, reported in 5 West Va., the court held, that on a question touching the validity of an act, the court can look, beyond the authentication of the act, to the journal of either branch, to see if the bill passed by the required number of votes, and that the legislative declaration upon that question is conclusive. In the supreme court of Maryland, in the case of *Berry* v. *The Baltimore and Drumpoint Railroad Co.,* 41 Md. 446, the court said: "Unquestionably a statute having the proper forms of authentication cannot be impeached or questioned upon *mere parol evidence."*

In *Happel* v. *Brethauer,* 70 Ill. 166, the court says: "We must take the law as we find it written in the statute. If the constitution has not been complied with in its passage, this fact must be shown either by the printed journals or the certificate of the secretary of state, the custodian of legislative proceedings. *In no other mode can we be properly advised."*

In the case of the *Louisiana State Lottery Co.* v. *Richoux,* 23 Louisiana, the court held extrinsic evidence not admissible to invalidate a statute. "Courts will presume that the constitutional rules, laid down for the passage of laws, have been complied with by the law-maker, and when duly promulgated will accept them without inquiry as to the observance or non-observance of the required rules and forms in the preparation and passage of bills. The opposite doctrine, we apprehend, would lead to a very confused and perplexing state of affairs in the administration of laws. If courts can examine the regularity of the proceedings had in the passage of bills, what is to prohibit them

from determining whether any other constitutional provision, merely ancillary to the exercise by the general assembly of the appropriate function of law-making, has been properly exercised?" Every presumption may be made in favor of the statute. 2 Wharton on Evidence, § 1309.

" When the legislature is acting in the apparent performance of legal functions, every reasonable presumption is to be made in favor of it." Cooley on Con. Lim., 135.

The journal of the proceedings of the senate of Virginia, which the constitution requires to be kept and published, does say, that upon the call of the *" ayes "* and *" noes "* on the passage of the senate bill, No. 321, entitled an " act to apportion the representation of the state of Virginia in the congress of the Unitied States," twenty-eight senators voted—nineteen *ayes* and nine *noes.* In the face of this solemn record, in which the senate of Virginia certifies its proceedings—in a matter of fact— relating to its own conduct—in the apparent performance of its legal functons—this court is asked to inquire into or dispute the veracity of that certificate.

To do this, would be to violate both the letter and the spirit of the constitution ; to invade a co ordinate and independent department of the government, and to interfere with the separate and legitimate power and functions of the legislature.

We are of opinion, that the journal of the senate conclusively shows, that senate bill No. 321, entitled "an act to apportion the representation of the state of Virginia in the congress of the United States," did pass the senate of Virginia, by the majority required by the constitution, over the governor's veto ; that it did receive an affirmative vote of two-thirds of the senators present when the question was put, "Shall the bill pass notwithstanding the objections of the governor?" and that such evidence is furnished in the journal of the proceedings of the senate, which imports absolute verity and cannot be disputed.

It is further alleged by the relator, that this said act is unconstitutional and void because the senate had no right to recognize

"*pairs ;*" and because the bill does not conform to the requirements of Article 5, sec. 13, of the constitution of Virginia, by making the congressional districts of contiguous counties, cities and towns; compact; and, as nearly as may be, equal in population. Each house of the general assembly is vested with the power of making rules for its own government; and it necessarily has the power to grant members leave of absence, excuse them from voting, when proper, and recognize what are called *pairs.* The laying off and defining the congressional districts is the exercise of a political and discretionary power of the legislature, for which they are amenable to the people, whose representatives they are.

It follows that the *rule nisi* in this case, must be discharged, and the writ prayed for by the relator denied.

WRIT DENIED.