Minshall, J.
On May 17, 1886, the general assembly passed an act entitled an act to establish an efficient board of public affairs in cities of the first grade of the first class ” (83 Ohio L. 173). It abolished the board of public works created by an act passed March 3,1880, and, among other things, provided .that the members of the board of public affairs should be appointed by the governor, and should have all the powers, perform all the duties and be the successor of the board of public works. The members of the board of public-affairs for the city of Cincinnati, the respondents in this action, were appointed by the governor, qualified as required by law, entered upon the duties of their board and the performance of the same as far as they were permitted by the relators, and were continuing to do so, whereupon the relators, who constituted the board of public works of said city at the time of the passage of the act of May 17, commenced this proceeding, setting forth their title as members of the board of public works for the city of Cincinnati, and asking that the respondents should be required to show by what title they usurped the functions of the board of the relators, and that they might be ousted therefrom by the judgment of this court.
The respondents in their answer admit that they have assumed and claim the right to perform, the public duties that were heretofore incumbent on the relators as the board of public works of Cincinnati, but say that the act that created the board of the relators was repealed by the act of May 17,1886, creating the board of the respondents, and that thereby the board of public works was abolished, and that the board of public affairs was made and became its successor, and that the performance of all its powers and duties was conferred on the board of the respondents; and *360 ask that the relators may be restrained from interfering with, them in the performance of their duties as such board of public affairs.
The relatoi’s reply, and in the first, second, third, and fourth paragraphs of the pleading, in substance deny (1) that the act creating the board of the respondents was, on the 17th of May, 1886, or at any other time, passed by the general assembly of the state, or that it ever became a law of the state; and (2) aver that, if it was passed, the legislature had no power to confer the appointment of the board on the govermor, and that it is unconstitutional and void.
In the fifth, and last, paragraph, it is, in substance, averred that the adoption of the act of May 17th was the result of a conspiracy between the president of the senate and seventeen members, entered into for the purpose, among other things, of abolishing the board of public works and establishing; in the language of the pleading, “ the so-called board of public affairs.” That in pursuance of this conspiracy, while Johu O’Neill and nineteen other members of the senate were absent from the senate chamber, and while only seventeen members, less than a quorum, were present, the president of the senate, with the advice and consent of the seventeen members then present, in violation of the constitution of the state and the rules of the senate, corruptly caused the clerk of the senate to enter upon its journal a resolution that John Brashears and three others, naming them, were not duly elected, and that George W. Hardacre and three others, naming them, were duly elected and entitled to seats therein; that the vote was not taken by yeas and nays, and that the majority of the members were at that time temporarily absent from the state. That afterward, without being sworn, the four, so admitted, claimed to be. members of the senate; and on the 17th of May, during the continued absence of the members before named, from the state of Ohio, the said pretended act of May 17, 1886, was declared passed and signed by the president of the senate ; and it is then averred “ that the president of the senate, the speaker of the house of representatives, and the secretary *361 of state,'at the time of the signing and filing of said pretended act of the general assembly of the state of Ohio, well knew that the same had not been passed, but that the same was fraudulent and void;” and that there was at no time, from the 8th of May until the adjournment of the legislature, a quorum of duly elected members present in' the senate to do business.
A demurrer has been interposed to the first four paragraphs, and a motion made to strike out the averments contained in the fifth one. The demurrer raises the question of the constitutionality of the law, and the motion, the validity of its passage.
1. If the facts averred in the motion may be considered by a court, on the question whether a statute, that appears upon the journals of both houses of the legislature to have received the requisite concurrence of their members, as provided in section 9, article 2, of the constitution, that is duly attested as a law by the presiding officer of each house, as provided in section 17, article-2, of the same instrument, and has been enrolled and filed in the office of the secretary of state as a law, as provided by statute, section 128, Revised Statutes, is not what it is thus authenticated to be, then this motion should be sustained, otherwise it should be overruled.
It seems to be well settled that courts will take judicial notice of all that is necessai’y to the authentication of a statute. It is said by Wharton, in his work on Evidence (section 295): “ Courts will take judicial notice of the modes by which domestic laws are authenticated. Hence an English court is supposed to be judicially acquainted with the rules, practice, and prerogatives of parliament; an American court with the rules, practice, aud prerogatives of the federal and state legislatures to which" it is subject. So, as we have seen, a court will take judicial notice of the journals of a legislature to determine whether an act is constitutionally passed, or whether it has passed by reason of not having been returned in proper time by the governor.” There is then no need of stating what appears upon the *362 journals of a legislature relative to the passage'of a law; such, matters are judicially noticed without averment, and the same effect given them as if averred. Bliss on Co. PI. 178. As no issue of fact can be taken upon what a court is required as a court to know, such averments in a pleading are redundant and irrelevant, and on motion should be stricken out. Pom. Rem., section 551.
Therefore, unless courts may hear parol testimony, offered to affect the passage of a duly authenticated statute, the matter contained in the fifth paragraph of the reply should be stricken out as redundant and irrelevant, as it appears from the journals of the two houses of the general assembly that this act received the requisite concurrence of the members, and was duly attested by the presiding officer of each house; audit has also been duly enrolled and filed in the office of the secretary of state, and published iii the laws of Ohio. The journals of the legislature, the office of the secretary of state, and the published laws, show this; of all which, we take judicial notice.
Counsel have exhibited unusual industry in looking up the various cases upon this question; and, out of a multitude of citations, not one is found in which any court has assumed to go beyond the proceedings of the legislature, as recorded in the journals required to be kept in each of its branches, on the question whether a law had been adopted. And if reasons for this limitation upon judicial inquiry in such matters have not generally been stated, it doubtless arises from the fact that they are apparent. Imperative reasons of public policy require that the authenticity of laws should rest upon public memorials of the most permanent character. They should be public, because all are required to conform to them; they should be permanent, that rights acquired to-day upon the faith of what has been declared to be law shall not be destroyed to-morrow, or at some remote period of time, by facts resting only in the memory of individuals.
One of the earliest cases on the subject was that of The King v. Arundel, Hobart, 109. It involved the question *363 whether a private statute had been enacted. The court there hold that the act could only be tried by itself — its enrollment in the chancery, the chancery being then, as the office of the secretary of state is with us, the depository of the laws. The court said: “ When the act is passed the journal is expired.” Many cases follow this decision, adopting the attested enrollment of the law as conclusive on the question of its passage. Pangborn v. Young, 32 N. J. Law. 29, is an instructive ease on the reason and policy of the rule. See also: People v. Devlin, 33 N. Y. 269; People v. Commissioners, 54 N. Y. 276; Eld v. Gorham, 20 Conn. 8; Sherman v. Story, 30 Cal. 258; Louisiana State Lottery Co. v. Richoux, 23 La. Ann. 743; State v. Swift, 10 Nev. 176; Speer v. Plank Road Co., 22 Pa. St. 376.
But in many of the states, and without doubt in our own, the journals are to be regarded. They are required by the constitution to be kept. The language is: “ Each house shall keep a correct journal of its proceedings, which shall be published, . . . and on the passage of any bill the vote shall be taken by yeas and nays and entered upon the journal; and no law shall be passed in either'house without the concurrence of a majority of all the members elected thereto.” Sec. 9, art. 2. Now in the time of Iiobart the journals were not regarded as records; they were “ remembrances for forms of proceedings to the record,” that is to say, the enrolled bill.
In this state what appears on the;journals affecting the passage of a law has been noticed by this court, but in no instance has attention been given to any thing not appearing upon the journals, though it be the omission of a requirement of the constitution.
In Fordyce v. Godman, 20 Ohio St. 1, the question was whether a certain statute allowing what is known as the “Morgan-raid claims” had received the vote required by section 29, article 2, of the constitution, namely, two-thirds of the members elected to each branch of the general assembly. The law was held invalid, not by going outside of, but because it appeared from, the journal that the bill had not received the requisite vote. The attestation of the pre *364 siding officers is not, under our constitution, sufficient, in any ease, to convert into a law a bill that has not received the requisite vote; for by section 9, article .2, ou the passage of any bill the vote must be taken by yeas and nays, and entered on the journal; and if this be omitted the bill can not become a law, whether it receive the requisite vote or not. There is no such provision as to the seating or unseating of members.
In Miller v. State, 3 Ohio St. 475, one of the questions was whether the bill had been read on three different days in each house, as required by section 16, article 2. The court, Thurman, J., delivering the opinion, was inclined to treat the provision as directory, but said: “Whether the constitution, in the particular named, is merely directory or not, it can not be gainsaid, it seems to us, that where the journals show that a bill was passed, aud there is nothing in them to show that it was not read as the constitution requires, the presumption is that it was so read, and this presumption is not liable to be rebutted by proof.” And in State v. Moffitt, 5 Ohio, 363, it was determined by this court as. early as 1832 that the journal can not be 'contradicted by parol proof. And so in Koehler v. Hill, 60 Iowa, 545, the supreme court of Iowa held that parol evidence is not competent to supply a correction in the record of the journal; that is to say, that an amendment to the constitution of the state submitted by one general assembly was the same in form and words as that agreed to at the subsequent assembly.
There are numerous cases in the decisions of the different states to the effect that the journals of a legislature may be noticed by courts on the question whether a bill became a statute or not. Opinion of the Justices, 52 N. H. 622; Judicial Opinion, 35 N. H. 579; People v. Mahaney, 13 Mich. 481; Moody v. State, 48 Ala. 115; Grob v. Cushman, 45 Ill. 119; Board Supervisors v. Heenan, 2 Minn. 330; In re Roberts, 5 Col. 528. The latter presents an extensive collection of the cases. But, as before stated, none are to be found in which the courts have, for any purpose affecting *365 the validity of a statute, gone beyond such permanent memorials of its enactment.
The case of The State v. Francis, 26 Kan. 724, is cited and relied on by counsel for relators. But it does not sustain them. There the house of representatives of Kansas had, by law, at that time, but 125 members; it had in fact 129. Eour of these had by law no seats in the house, and could in no event be entitled to participate in its proceedings; they were simply supernumeraries. The journal showed that the concurrence of three, at least, of these supernumary members was requisite to the passage of the law in question, and that all of them voted for it. The court took notice of these facts appearing upon the journal, and of the further fact that, as a matter of law, the house then consisted of 125 members only, and held that the bill did not become a statute. In no case, however, is the rule that limits judicial inquiry in questions of this kind to the journals of the legislature, and excludes all parol testimony, more strongly stated. The language used is as follows: “In our opinion, the enrolled statute is very strong presumptive evidence of the passage of the act and of its validity, and that it is conclusive evidence of such regularity and validity, unless the journals of the legislature show, clearly, conclusively, and beyond all doubt that the act was not passed regularly and legally. ... If there is any room to doubt as to what the journals of the legislature show, if they are merely silent or ambiguous, or if it is possible to explain them upon the hypothesis that.the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid; but in this state, where each house is required by the constitution to keep and publish a journal of its proceedings, we can not wholly ignore such journals as evidence.” That the invalidating facts must clearly and beyond reasonable doubt appear from the journal is sustained by Osburn v. Staley, 5 W. Va. 85.
In Evans v. Browne, 30 Ind. 514, the proof, as offered from the journal, in connection with parol testimony, was to the effect that the act in question had passed *366 the house after it had been reduced to less than a constitutional quorum by the resignation of forty-two of its members. The court refused to take notice of the aver-, ments, following the rule in those cases that adopt the attested enrollment of the law as the indisputable evidence of its authenticity. The case is an instructive one on the policy of the rule that rejects an issue of fact on the question whether a statute was adopted and became a law or not.
In Wise v. Bigger, 79 Va. 279, it was claimed that an act apportioning the'congressional representation in that state, having been vetoed by the governor, had not repassed the senate by the requisite affirmative vote; that there were at least twenty-nine members present when the question was put, “ shall the bill pass notwithstanding the objections of thogovernor,” and that nineteen voted aye, and nine nay— the constitution requiring that it should be affirmed by two-thirds of the members present; but the court held that the journal did not show that there were more than twenty-eight present, and that it imported absolute verity. And to inquire into the veracity of the journal of the senate, in which it had recorded its proceedings, the court said “ would be to violate both the letter and spirit of the constitution; to invade a co-ordinate and independent department of the government, and to interfere with the separate and legitimate power and functions of the legislature.”
As to the averment that the passage of the act was part of a conspiracy, entered into between the president of the senate and seventeen of the members, carried into effect in the absence from the state of a majority of the members of the senate, it is sufficient to say that such suggestions have frequently been made for the purpose of inducing judicial inquiry into the conduct of legislative bodies, but the inquiry has as frequently been declined by the courts as not only indecorous, but as subversive of the independence of the legislature as a co-ordinate branch of the government. There is no authority for it in the constitution and laws of this state, and it is opposed to the practice and polity of our system of government. Slack v. Jacob, 8 W. *367 Va. 613; McCulloch v. State, 11 Ind. 431; Wright v. Defrees, 8 Ind. 298; Evans v. Brown, 30 Ind. 514; Sunbury & E. R. Co. v. Cooper, 33 Pa. St. 278; Harpending v. Haight, 39 Cal. 202. In Miller v. The State, 3 Ohio St. 484, it is said by Thurman, J.: “A disposition to disregard it (the constitution) is no more to be imputed to the legislative than to the judicial department of the government, and ought not tobe imputed to either.” “And,” it is said by Cooley, “ although it has sometimes been urged at the bar that the courts ought to inquire into the motives of the legislature where fraud and corruption were alleged, and annul their action if the allegations were established, the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered upon.” Const. Lim. *187.
■The possible consequences of limiting judicial inquiry to what is shown by the journal is much exaggerated. It is not perceived how any limited number of members, without the acquiescence, or such indifference as would amount to acquiescence, of the majority, could make up a journal that would revolutionize the legislature and deprive the people of their duly elected representatives. The supposed case of less than a majority of this court causing a judgment to be entered of record is not apropos. Eor if it were done the only remedy would be in this court, for the reason that there is no other tribunal or department of the government that could afford one. And by parity of reasoning the only correction that can be made in a legislative journal is by the body that caused it to be made. The sug-r gestión that fraud or bad motives in those who caused it to be made might defeat the remedy would apply to the one case as well as to the other. But confidence must be reposed somewhere, and why not in a legislative body, as to the keeping of its journals, as well as in this court, as to the keeping of its records? Besides, the people are the final tribunal before whom, as a rule, such delinquencies must be settled. Cooley’s Const. Lim. *168. And,in the case of legislators, the return to the people being at comparatively short intervals of time, it is difficult to see how such *368 abuses, if they exist, can be of very long standing. And in such cases it is “ better to bear the ills we may have than fly to others we know not of.”
2. The claim is', that the act of May 17, 1886, creating the board of public affairs, did not pass the senate and become a law, because, at that time, there was not a constitutional quorum in it; and this is based on the claim that there was none px-esent on May 8, 1886, when the four members from Hamilton county were seated in the place of the four that were ousted. Now, if this were conceded, it does not follow that the act itself is invalid. No doctrine is better settled, in the jurisprudence of the English-speaking people, than that the validity of an act done by one in a public office or station is not, as a rule, to be tried by the title of the pei'son to that office.
One of the best considered cases on the subject is that of State v. Carroll, 38 Conn. 449. It contains an exhaustive examination of the numerous cases in which the doctrine has been discussed and applied, and points out an error in the report of the case of Rex v. Lisle, as made by Strange, 1090, that, as is showix, has been the soux’ce of erx’or in some of the subsequent cases. The result of the investigation made by the leaxmed judge is, that competent authority in the appointing or electing body is not requisite to make a de facto officer.
The doctrine has been applied in a number of cases by this court. Thus, in The State v. Alling, 12 Ohio, 16, the appointment of a clerk of the coux’t of common pleas, made by associate judges who were simply such de facto at the time of the appointment, having been previously legislated out of office by an act of the legislature, was held to be a valid one. This decision was made after the judges had been ousted from office on a proceeding in quo warranto. State v. Choate, 11 Ohio, 504.
In State v. Jacobs, 17 Ohio, 143, the appointment of a county treasurer by a board of county commissionei's, two of whom were de facto commissioners only, their legal titles having been destroyed by the division of Auglaize *369 county, was held valid. The fact that they were recognized by the county auditor, who recorded their proceedings, and with the other commissioner, had the control of the books and papers, made, in the opinion of the court, a strong case of an officer de facto. In Ex parte Strang, 21 Ohio St. 610, the ground on which the seutence of an acting police judge was claimed to be invalid was, that the law under which he was appointed was unconstitutional. This question the court deemed it unnecessary to decide, for the reason, as stated, that if he was a judge de facto, his judgments would be as unquestionable by a proceeding in habeas corpus as if he were a judge de jure. It was then assumed that the legislature could not constitutionally authorize" the mayor to appoint a police judge; hut, as he was assuming to discharge the duties of the officer under the appointment, when he pronounced the sentence on Strang for a violation of an ordinance of the city, the court, after a full examination of the question in the light of the authorities, held that the acting police judge was a judge de facto, and sustained the sentence. White, J., delivering the opinion, said: “The true doctrine seems to be, that it is sufficient if the officer held the office under some power haying color of authority to appoint; and that a statute, though it should be found repugnant to the constitution, will give such color.”
It may then be asked, whether members of a legislature, seated by a vote of a number less than a constitutional quorum, have less color of title to their seats than a judge who holds his place by the appointment of one acting under an unconstitutional statute. In either ease it may be said, there was no constitutional warrant for the act on which the title rests ; and if the judgments of the one are valid, laws enacted by the body in which the others sit, and whose presence alone make a quorum therein, should also be held valid. Like reasons of public policy and convenience apply in either case.
In Scovill v. Cleveland, 1 Ohio St. 126, the validity of a certain assessment was questioned, inter alia, on the ground that the ordinance under which it had been made on the *370 property of the plaintiff, was not passed by a number of legal eounoilmen equal to the majority of a legal council. To this Ranney, J., says: “We are still equally clear that, while they continued to act de facto in virtue of their election, their proceedings would be valid and binding.”
If the validity of every law passed by a legislature were made to depend upon the existence of a quorum at the time of its passage in each house, whether the fact appears from the journal of the proceedings therein or not, the inconvenience that would result would be intolerable. Evans v. Brown, 30 Ind. 520. To the private embarrassments that would ensué in the matter of contracts and dis|30sitions of property made upon the faith of what, by the public records, appeared to be a law, must be added the effect that would necessarily be produced upon the public credit. If such were the law, no loan could be obtained, short of the most ruinous rates of interest.
We observe that a number of public loans have been authorized by statutes passed since the 8th of May, 1886. Now if any of these loans have been made, can it be that the security of the public creditor must depend upon whether, as a fact, there was a quorum present in the senate on that day? It is difficult to perceive how it could be claimed that, if one statute is invalid because there was no quorum at that time, the same reason would not affect the validity of other statutes passed since the same time.
What appears of record is certain and accessible to all, and all may with reason be held to have notice of such matters ; that which rests in parol is perishable, uncertain, and, in the nature of things, limited to the actual knowledge of a limited number. The necessity for certainty and publicity in the laws needs no higher reason for the exclusion of pai'ol testimony, offered to affect their authentication, than the perishable and uncertain nature of such testimony.
The case of Braidy v. Theritt, 17 Kan. 468, has been cited and relied on by counsel for the relators. It is not in point. *371 It was an action by Theritt to restrain Braidy, the alleged intruder, from interfering -with him while discharging his duties as a member of the city council. It does not present, nor decide, that an ordinance passed by the vote of Braidy would have been invalid; The court was careful to confine its decision to the question of title arising between the two parties.
Nor is it in point on the question, as to whether the four members of the senate, seated by less than a quorum, if such was the fact, are not de facto members. Braidy intruded into the council by his own act, Theritt having been returned elected. Here the contestants were seated by the members present, acting as a senate, and it is this act of those present, exercising the functions of a senate, that gives at least a color, if not a legal title, to those seated.
We are, then, of opinion that the motion to strike out the fifth paragraph of the reply should be sustained; and, as the act appears frorn the journals of the legislature to have been duly passed, has been duly attested and filed in the office of the secretary of state, and has been published as a law, the writ must be refused, unless it in some way clearly contravenes the provisions of the constitution.
3. This question is raised by the demurrer to the reply. It is claimed that the law is unconstitutional, because it authorizes the governor to appoint the members of the board created by the act. It has been argued with great zeal and ability by counsel for the relators; but with due deference we think it can hardly be regarded as an open question in this state, since the decision in The State v. Covington, 29 Ohio St. 102, sustaining the act under which the respondents in that case had been appointed by the governor. That case was followed in The State v. Baughman, 38 Ohio St. 455, sustaining the law authorizing the court of common pleas to appoint police commissioners for the city of Xenia. The question was fully examined by McIlvaine, J., in the Covington ease, and we are entirely satisfied with the reasoning upon which the judgment was *372 placed. Ample power is conferred on the general assembly for the government and organization of cities by general laws; the legislative power of the state is vested in it by section 1, article 2, of the constitution ; it is required by section 6, article 13, to exercise this power by the enactment of general laws for the organization of cities and villages, and it is, in the exercise of this power by the general assembly, that theentire system of municipal government for cities and villages has been created in this state. The entire details of the system that may be devised, and the public agencies that may be employed for administering it, and whether they shall be elected or appointed, is left by the constitution to the wisdom of the legislature.
The constitution expressly provides that certain officers shall be elected, and among these includes “such county and township officers as may be necessary ” (section 1, article 10)', and then in section 27, article 2, it is provided that the election and appointment of all other officers not otherwise provided for in this constitution “shall be made in such manner as may be directed by law.” This is not only significant in itself, but seems to preclude the claim that there is any general spirit pervading the constitution, opposed to vesting the appoinment of municipal officers in the governor or elsewhere. Whatever effect may be claimed for section 20 of the bill of rights, it can in no way affect the election or appointment of officers whose election is not provided for in the constitution. The power conferred on the general assembly to provide for the election and appointment of officers is subject only to the limitations imposed by the instrument confering the power. “ The true rule for ascertaining the powers of the legislature is,” as stated by Mcllvaine, J., in the State v. Covington, supra, “ to assume its power under the general grant ample for any enactment within the scope of legislation, unless restrained by the terms or the reason of some express inhibition.”
To this may be added what is said in The State v. Constantine, 42 Ohio St. 442, that “ the manner of filling an office by *373 appointment is unrestricted, save only that it can not be by ‘ an election,’ which is pointed out by the constitution as a different mode of filling an office.”
Much reliance is placed upon certain cases decided by the supreme court of Michigan. The case of Board of Park Commissioners v. Detroit, 28 Mich. 238, has little or no application to this case. It involved the question only whether the legislature could compel a city to incur an expenditure, as for a park, against the consent of its council. Nothing of the kind is contemplated by this act. The board of public affairs may supervise and control the making of public improvements by the city, but it can not initiate or compel expenditures for such purposes without the approval of the city council.
It may act, and was probably designed, as a salutary check upon public extravagance, and may afford a wholesome administration of the affairs of the city.
The case of The People v. Hurlbut, 24 Mich. 44, is in point. It involved the validity of an act establishing a board of public works for the city of Detroit. The appointment was made by the legislature in the act creating the board. It seems there is no express inhibition in the constitution of that state against the appointing power being exercised by its legislature, as in our own (section 27, article 2.) The law was held invalid, not because it violated any express provision of the constitution, for it was admitted that it did not, but because it was thought to contravene certain principles of local self government, that the court by way of inference regarded as part of their system of government. And still another distinction was taken, resting upon mere inference, and much relied on in the subsequent case, between the public and proprietary characters of a municipal corporation. Supreme control by the legislature over its public character is conceded, while it is thought that in its latter character it has, or should have, the same independence in the management of its proprietary interests that is conceded to a private corporation. These distinctions are found to be illusory and without any well founded distinction in prin *374 ciple. 1 Dill. Mun. Cor., section 67. They have not been adopted to any extent by other courts. People v. Draper, 15 N. Y. 533, per Denio, C. J.; Darlington v. Mayor, 31 N. Y. 193; State v. Seymour, 35 N. J. Law, 47; State v. Valle, 41 Mo. 29; Daley v. St. Paul, 7 Minn. 390.
"Well settled rules of construction forbid courts from assuming the liberty of declaring an act void because in their opinion it is opposed to a spirit supposed to pervade the constitution, but not expressed in woi’ds. In the language of Judge Cooley, “the courts can enforce only those limitations which the constitution imposes; not those implied restrictions which, resting in theory only, the people have been satisfied to leave to the judgment, patriotism, and sense of justice of their representatives.” Const. Lim. *128, *171.
Over the wisdom or policy of this legislation this court has no control. In the language of Judge Black, in Sharpless v. Mayor, 21 Pa. St. 162: “ There is no shadow of reason for supposing that the mere abuse of power was meant to be corrected by the judiciary.” The remedy in such cases is with the people.
Being persuaded that this act in no way violates any provision of the constitution,
• Writ refused.