STEPHEN H. WEEKS, in the name of and by authority of the Attorney General, petitioner for mandamus, *vs.* ORAMANDAL SMITH, Secretary of State, and CHARLES W. TILDEN, Secretary of the Senate.

Kennebec. Opinion May 31, 1889.

*Mandamus. Judicial inquiry into passage of laws. Records. Evidence. "Medical Registration Act" of 1887, not a law.*

Mandamus to redress a public grievance must be moved for and prosecuted by the attorney for the state in the state's behalf.

Whether an act of the legislature be constitutionally passed is a judicial question, to be decided by the bench from an understanding of public matters, regardless of plea or proof.

The secretary of state is a constitutional officer, and is required to "carefully keep and preserve the records of all the official acts and proceedings of the Governor and Council, Senate and House of Representatives;" and such records are to be kept in his office.

The records of the proceedings of the legislature in the secretary's office, fair upon their faces, showing no infirmity that would invalidate the record if not explained, are conclusive evidence of what they purport to be, and can not be overturned by parol evidence.

The "Medical Registration Act" of 1887, is shown by the record in the secretary's office to have been vetoed by the governor and refused a passage over the same;—and the record is conclusive.

ON REPORT, AND EXCEPTIONS.

Petition for mandamus, in the name of and by authority of the attorney general, to compel the secretary of state to restore a public law to its place in his office, among the public laws of the state.

It appears by the records of the secretary of state's office that the legislature of 1887, passed what is known as the "Medical Registration Act," and sent the same to the governor for his approval, who within the time fixed by the constitution returned the bill without his approval, to the senate, where it originated, with a veto message stating his objections, as required by the constitution; and that the bill was there refused a passage over the governor's veto.

The petition was filed in Kennebec county, June 25, 1888, by

the relator in behalf of the Maine Medical Association, of which he is the president. The hearing took place before the chief justice July 11, 1888.

The respondents appeared by the attorney general and resisted the petition.

The material facts appear in the testimony of the governor's private secretary, called by the relator, the governor being dead. He testified, in substance: that on the morning of the 17th of March, the last day of the session, this bill with others was upon the governor's table, in the executive chamber, awaiting executive approval. The governor proceeded to consider and approve them, but directed his secretary to lay this one aside for the present. The governor had been previously furnished with a copy of the bill, and had read it and considered of it. He saw various persons and conferred with them concerning it, during the forenoon. About one o'clock he took the bill from its jacket, or envelope, signed it and handed it to his secretary who replaced it in its jacket, and laid it upon the governor's table. Immediately, the governor, without remark or direction to his secretary, left the executive chamber, and went to his home, in Hallowell, about two miles distant, for dinner. After his departure, his secretary took the bill to the office of the secretary of state, and left it with a clerk who entered it upon a list of acts approved, kept in a book for convenience, and to aid in the dispatch of business and not by requirement of law. The private secretary of the governor was accustomed to take bills from the executive chamber after being approved by the governor and without special orders to do so, either carry them to the office of the secretary of state, or deliver them to the messenger of the governor and council, to be taken there.

The private secretary further testified, in substance: that in about one hour and a half, after the governor left the executive chamber for dinner, he returned and immediately called for the "Registration Act," and upon being informed by his secretary that it had been carried to the office of the secretary of state, he directed his private secretary to "go down and get it,"—which he did. Thereupon the governor erased his name from the bill, by

drawing his pen through his signature, and returned the bill without executive approval, together with his objections, to the senate.

The following is a summary of the exceptions filed by the relator.

The relator claimed upon the evidence that the bill in question was, after full consideration, approved by the governor on the seventeenth day of March, 1887, in the forenoon, and was by him left in the possession of his private secretary, to be delivered to the secretary of state and deposited in his office among the public laws of the state ; and that the governor some hours after, upon his return from dinner to his office in the state house, had changed his mind in regard to the approval of the bill and thereupon had determined to recall the act from the office of the secretary of state.

The relator further claimed upon the evidence that the governor, having on his return from dinner recalled the bill from its place of deposit in the secretary of state's office, was hesitating for several hours as to what action to take upon the bill, and did not determine to return the same, with the alleged veto message to the senate, until about eight o'clock in the same evening.

The relator at the hearing offered to introduce evidence of declarations of the governor, made during the time, from the return of the governor from dinner on March seventeenth, to the sending to the senate of the veto message, in the evening of that day, to the effect that, before going to dinner on March seventeenth, he had finally decided to approve the bill and had affixed his signature of approval thereto and sent it down to the secretary of state's office, and that it was then too late to do anything further about it; that remarking the strong vote, about three to one, by which it had passed, he had decided to approve the bill and leave the responsibility of the law, if it worked badly, upon the legislature ; that later, and during the evening of the same day, the governor repeated the declarations to the same effect; that he had signed the bill and sent it down, but added that his impression during the afternoon had been that it was too late for him to do anything further about it, but that he had since been informed that he had a right to withdraw his approval, if he desired. The

relator also offered evidence of declarations of the governor to the same effect made at a later period; all of which evidence was excluded by the chief justice.

The case was reported upon the petition and evidence by consent of the parties, to the full court, to be heard at Portland at the July term of the law court. The full court were to decide the questions, and to determine whether the petition should be granted or not.

The "Medical Registration Act" has not hitherto been published, nor obeyed, as a public law of the state.

*C. W. Goddard, and Symonds and Libby,* for relator.

Mandamus is the appropriate remedy, apparently the only adequate one. R. S., c. 77, § 5; c. 102, §§ 16, 19; *Baker* v. *Johnson,* 41 Maine, 15; *Williams* v. *Co. Com.,* 35 Id. 345; *Smyth* v. *Titcomb,* 31 Id. 272; *Harriman* v. *Co. Com.,* 53 Id. 83; *Andrews* v. *King,* 77 Id. 224; High, Ex. Rem. §§ 63, 65, 80.

The question whether a statute exists and is valid and in force or not, is a purely judicial question, a question for the court. *Gardner* v. *The Collector,* 6 Wall. 499; *Town of S. Ottawa* v. *Perkins,* 4 Otto, 286; *Post* v. *Supervisors,* 15 Otto, 667; *Legg* v. *Mayor,* 16 Am. Law Reg., N. S. 25; Albany Law Jour., June 9, 1888, citing *Sherman* v. *Story,* 30 Cal. 253, S. C. 89 Am. Dec. 93; *Bank* v. *Ottawa,* 105 U. S. 667; *People* v. *Com. of Highways,* 54 N. Y. 276; *People* v. *Allen,* 42 N. Y. 381; *People* v. *Petrea,* 92 N. Y. 138; *Berry* v. *R. R.,* 41 Md. 446; *Opinion of the Justices,* 35 N. H. 580; *The Soldiers' Voting Bill,* 45 N. H. 607; *Opinion of the Justices,* 52 N. H. 622.

The statute under consideration is the law of the state. *People* v. *Hatch,* 19 Ill. 283; Cool. Con. Lim. (5th Ed.) *186; *People* v. *Devlin,* 33 N. Y. 283; *Tarlton* v. *Peggs,* 18 Ind. 26; *Jones* v. *Hutchinson,* 43 Ala. 721; *Harpending* v. *Haight,* 39 Cal. 189; *Marbury* v. *Madison,* 1 Cranch, 137; *Fowler* v. *Pierce,* 2 Cal. 165; *Prince's case,* 8 Coke, 28; *Bolander* v. *Stevens,* 23 Wend. 103; *People* v. *Purdy,* 4 Hill, 394; *Opinions of the Justices,* 70 Maine, 560, *et seq;* *People* v. *Mahaney,* 13 Mich. 492; *Evans* v. *Brown,* 30 Ind. 514; *R. R.* v. *Governor,* 20 Mo. 353; *State* v. *Whisner,* 35 Kans. 272; *Wolfe* v. *McCaull,* 76 Va. 876.

Exceptions : The governor's action in the forenoon was final. The bill thereby became a law, and his declarations in the afternoon could not be a part of the *res gestae* and were properly excluded. If otherwise, they must be regarded as parts of the *res gestae*, and in that case, are admissible.

*Orville D. Baker*, attorney general, for respondents.

There is no controversy but what it has been recognized and understood, that the bill was finally refused a passage over the veto, and never did become a law ; all the people and state officials have governed themselves accordingly, ever since 1887.

Case differs from those cited by the relator, where the courts have gone underneath the apparent record to inspect and see whether the constitutional requirement was lacking, which had been supposed to exist.

The question is whether it is the duty of the court to breathe life into a rejected bill, where every step necessary for its rejection, as prescribed by the constitution and statute has been carried out, and received the solemn sanction, both of the executive and legislative branches of the government. The judicial branch is asked to set aside the deliberate and approved judgment of the two co-ordinate branches, after nearly two years have elapsed from the time when these events occurred, which, if ever, would make it law. The court has no power to act in this matter where every constitutional step has been taken to complete the rejection of the law ; or to inquire into the evidence sought to be brought forward. No case cited justifies the exercise of such power.

The private memorandum book kept by the clerk in the secretary of state's office for his own convenience is not a public record. If admitted in evidence, the question would then arise whether the governor had a right to reconsider his own action, and erase his own signature on the bill, which he had signed, the erasure being made within the constitutional five days, which he has, to consider his action. The sole technical question would be then, whether by virtue of some assumed or grown up practice in the office among the clerks, that power, vested in him under the constitution, had been taken away from him, without his concurring mind, so far as the measure is concerned. The purpose

of this constitutional provision is to insure that nothing shall be done without serious and sufficient reflection ; that no final action shall be taken until the executive has the opportunity to carefully consider,—and reconsider his act. The position contended for by the relator strips him of that power; ours permits its exercise. The usual routine of office, adopted by subordinates, can not strip him of this power, or the power to sign bills only upon his matured approval. It attaches to each bill, and can not be abridged by the superserviceable act of any subordinate in his office.

"The right to reconsider : *People* v. *Hatch*, 19 Ills. 283. The right to retract approval : *State* v. *Whisner*, 35 Kans. 272. The bill after being signed was not voluntarily placed by the governor in the custody of some independent department. *State* v. *Whisner, supra.* He gave no direction to have it taken any where out of his own custody when, after signing it, he went immediately to dinner. Any action the court can take in the present stage of the case would be nugatory and impossible. The act requires the appointment of a board of commissioners before May 1, 1887; certificates of registration must have been granted before January 1, 1888, with fines and imprisonment for neglect to register. Who shall command the governor to appoint the board of commissioners, upon whose appointment every provision of the bill is conditional ? The writ prayed for would put upon the statute book a law impossible to execute ; and a law made impossible by the laches of the petitioners.

*J. W. Symonds*, in reply.

This is an appeal to the discretion of the court. Not its will but its judicial discretion.

We contend that if the governor did not intend to deposit the bill in the secretary's office, still it became a law. Public policy requires that the outward act, the signing the bill, etc., must determine the fact of approval. There are no circumstances in this case to take it out of the operation of the general rule. The fact of deposit should control in all ordinary cases. The record shows that the governor, when he left his office at noon March 17, intended that law to go into the office of the secretary of state, and that he subsequently changed his mind. The routine of his

office is just as much an act of the executive, as any special act or any special word in any particular case.

The public act we wish restored is this enrolled act, and not the blotter.

There is no instance where the court will not receive secondary evidence when the public record, proved to have existed, has been proved to have been destroyed. We produce the original act itself. No lapse of time, nor neglect can deprive the people from ascertaining in a proper cause, evidence and proceedings, from its highest tribunal whether a public statute exists or not. It was impossible for us to obtain a decision of the court prior to the date when, under the act, the commissioners were to be appointed.

The record does not show that the senate knew the facts in regard to the deposit of the law with the secretary of state, when it acted upon the veto message.

HASKELL, J. The writ of mandamus is authorized by R. S., c. 77, § 5; but, as that statute does not provide in what behalf the remedy may be had, the rules of the common law apply.

A private person may move for the writ, in proper cases, when his personal rights have been invaded beyond those rights that he enjoys as a part of the public and that are common to every one; but, when the common right is invaded, it is a public grievance, and the remedy must be asked in behalf of the public, and by the proper officer, who is required by law to prosecute in the state's behalf.

If then, the right be a public right only, the attorney‾ for the state must move for the writ; and this he must do in the state's behalf, in good faith, asking for no more than he believes the public weal to demand. *Sanger* v. *County Commissioners,* 25 Maine, 291.

This application is signed by Stephen H. Weeks, who informs in the name of and by authority of the attorney general. That officer, however, appears and resists the application. It seems as if this resistance must work a discontinuance of the relator's petition and end the case.

But, waiving any irregularity in the proceeding, the court considers it best to decide the only remaining question in the case,

viz.: Whether "an act to regulate the practice of medicine," supposed to have been enacted in 1887, is a statute of the state.

This is a judicial question, and has been so regarded from the time of horn-books. Saunders said at the bar more than three centuries ago in the time of Edward VI, (1553):

"And as to the statute, you judges have a private knowledge and a judicial knowledge; and of your private knowledge you cannot judge, but may use your discretion.   *   *   *   For the judges ought to take notice of statutes which appear to them judicially, although they are not pleaded." And it was so held in the common bench, *Partridge* v. *Strange*, Plow. 83. See also the case of *The Prince*, 8 Coke, 28. (3 Jac. 1606.)

A judicial knowledge does not result from plea and proof; but comes from an understanding of public laws and records, of the methods of the executive and legislature, from a knowledge of history and of historical facts, and of matters of public notoriety and interest; and commands inquiry from the widest field of general information.

In the *Duke of Norfolk's case*, 1 Dyer, 93, (1 Queen Mary, 1553), it being much debated among the judges, whether royal assent had been given to an act of parliament through letters patent, bearing the sign-manual of Hen. VIII, for want of the genuine signature of the king, inasmuch, first, as it was written beneath the tests of the patent, whereas he was used to put it above the head; and second, because the writing was so perfect that it could not have been written by a man so ill and near his death as the king was, for he died the same night; the clerk of parliament brought the original record of the act before the judges for their inspection of it.

In *King* v. *Arundel*, Hob. 108, (14 Jac. 1617), the validity of a private act of parliament being called in question before the Lord Chancellor and Coke and Hobart, chief justices, they, each *more suo*, proceeded to inform themselves of it by consulting the original roll and the journals of parliament.

In *Rex* v. *Jeffries*, 1 Strange, 446, (7 Geo. 1721.) The original parliament roll was referred to, to correct an error in printed statutes.

So, in *Rex* v. *Robotham*, 3 Burr. 1472, (4 Geo. III, 1764), the original act of parliament was examined and Lord Mansfield, and his associates declared its true construction, notwithstanding a manifest error in it.

The result of all the authorities upon this question is well stated by Mr. Justice Miller, of the supreme court, in *Gardner* v. *The Collector*, 6 Wall. 505. He says, p. 511:

"We are of opinion, therefore, on principle as well as authority, that whenever a question arises in a court of law of the existence of a statute, the judges, who are called upon to decide it, have a right to resort to any source of information which, in its nature, is capable of conveying to the judicial mind a clear and satisfactory answer to such question; always seeking first for that which in its nature is most appropriate, unless the positive law has enacted a different rule." *Post* v. *Supervisors*, 105 U. S. 667. *State* v. *Wagner*, 61 Maine, 178.

Although the question to be here decided is a judicial question, the legislature not having enacted any rule touching the effect to be given to those considerations from which a conclusion must be reached, the rules of the common law must control so far as they can be of any aid.

The first and best evidence of a statute is the enrolled act, accomplished by the deposit of the original act, when approved by the governor, in the office of the secretary of state, who, by the Constitution, Art. V, § 4, is required to "carefully keep and preserve the records of all the official acts and proceedings of the governor and council, senate and house of representatives;" and, by R. S., c. 1, § 4, is required to give written notice to the senate and house of the approval of all public acts by the governor; and, by R. S., c. 2, § 44, is to cause to be printed all public laws passed at each session of the legislature within thirty days after the close thereof.

The deposit of a statute in the secretary's office is equivalent to the English custom of enrollment; and the original act thereby becomes the record; precisely as a private act of the English parliament has been held to be the record of parliament without enrollment; for it is not customary to enroll private acts, but only to deposit them with the clerk of parliament.

The houses of parliament were not required by law to keep journals; and these, therefore, have been held not to be records, but remembrances only, that expired when parliament dissolved. But our constitution, like the constitution of the United States and of most or all of the sister states, requires both branches of the legislature to keep journals of their proceedings, thereby making them public records to be looked to, when no higher or better source remains from which to establish the validity of a statute.

But when the original act, duly certified by the presiding officer of each house to have been properly passed, and approved by the governor, showing upon its face no irregularities or violation of constitutional methods, is found deposited in the secretary's office, it is the highest evidence of the legislative will, and must be considered as absolute verity, and cannot be impeached by any irregularity touching its passage shown by the journal of either house.

Legislative journals are made amid the confusion of a dispatch of business, and are therefore much more likely to contain errors than the certificates of the presiding officers are to be untrue. Moreover, public policy requires that the enrolled statutes of our state, fair upon their faces, should not be put in question, after the public have given faith to their validity. No man should be required to hunt through the journals of a legislature to determine whether a statute, properly certified by the speaker of the house and president of the senate and approved by the governor, is a statute or not.

The enrolled act, if a public law, and the original, if a private act, have always been held in England to be records of the highest order, and, if they carry no "death wounds" in themselves, to be absolute verity and of themselves conclusive.

In *King* v. *Arundel*, Hob. 108, the validity of an act of parliament came in question because of a suggestion that, although the act made no mention of a proviso, yet the indorsement upon it made in the lower house indicated its passage in that house with a proviso, and that it had not received the assent of both houses without the proviso.

The act, being a private act, as customary, had been properly

filed with the clerk of parliament and by him labelled and sealed, but not enrolled as public acts are, and thereby became the original record.

The lord chancellor and chief justices sought information from the original act and the journals of parliament and said:—

"Now journals are no records, but remembrances for forms of proceedings to the record; they are not of necessity, neither have they always been. They are like the dockets of pronotaries, or the particular to the king's patent. Co. Lib. 2, 34, b. and 16 Eliz. 331, of the particular. The last intended parliament, 10 Jac., if you be judged by the journal, it was a large and well occupied parliament, yet, because no act passed nor record is of it, it was resolved by all the judges to be no parliament.

"The journal is of good use for the observation of the generality and materialty of proceedings and deliberations as to the three readings of any bill, the intercourses between the two houses and the like; but, when the act is passed, the journal is expired. And in this journal there appears but one reading of the bill in the upper house when it passed, which is unlikely. But if the record of the act itself carry its death wound in itself, then it is true that the parchment, no nor the great seal, either to the original act, or to the exemplification of it, will not serve as in the 4 H. VII, 18, when the act was by the king with the assent of the lords (omitting the commons,) and was judged therefore void. And he that observes the case of 33 H. VI, 17, which was the only case relied upon by defendant's counsel, shall find it so; and upon this rule the doubt to be conceived, *scil.*, upon the parliament roll itself, not upon the journal."

The two leading cases in this country that hold to this doctrine are *Pangborn* v. *Young*, 32 N. J. L. 29, and *Sherman* v. *Story*, 30 Cal. 253. The New Jersey case so carefully considers the question and reviews the authorities that its conclusion is irresistible, that, under a constitution like our own, an enrolled statute can not be set aside by resort to journals of the legislature or other parol evidence. The court says:—

"The court can not try issues of fact; nor, with any propriety, could the existence of statutes be made dependent upon such

investigations. With regard to matters of fact, no judicial unity of opinion could be expected, and the consequence would necessarily be, that the conclusion of different courts, as to the legal existence of laws, from the same proofs, would be often variant, and the same tribunal, which to-day declared a statute void, might to-morrow be compelled, under the effect of additional evidence, to pronounce in its favor. The notion that the courts could listen upon this subject to parol proof is totally inadmissible, and it therefore unavoidably results, that if the journal is to be taken into consideration at all, its effect is uncontrollable; neither its frauds can be exposed, nor its errors corrected." * * * *

"The prerogatives, to make, to execute, and to expound the laws must reside somewhere. Depositaries of those great national trusts must be found, though it is certain that such depositaries may betray the confidence thus reposed in them. In the frame of our state government, the recipients and organs of this three-fold power are the legislature, the executive and judiciary, and they are co-ordinate—in all things equal and independent; each, within its sphere, is the trusted agent of the public. With what propriety, then, is it claimed that the judicial branch can erect itself into the custodian of the good faith of the legislative department? It is to be borne in mind that the point now touched does not relate to the capacity to pronounce a law, which is admitted to have been enacted, void by reason of its unconstitutionality. That is clearly a function of judicature. But the proposition is, whether, when the legislature has certified to a mere matter of fact relating to its own conduct and within its own cognizance, the courts of the state are at liberty to inquire into or dispute the veracity of that certificate? I can discover nothing in the provisions of the constitution, or in the general principles of government, which will justify the assumption of such superior authority. In my opinion, the power to certify to the public laws itself has enacted is one of the trusts of the constitution to the legislature of the state."

The California court says:—

"Better, far better that a provision should occasionally find its way into the statute through mistake, or even fraud, than

that every act, state and national, should at any and all times be liable to be put in issue and impeached by the journals, loose papers of the legislature and parol evidence. Such a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable."

The court of Ohio in *State* v. *Smith*, 44 O. 349, says:—

"Public policy requires that the authority of laws should rest upon public memorials of the most permanent character. They should be public, because all are required to conform to them; they should be permanent, that rights acquired to-day upon the faith of what has been declared to be law shall not be destroyed to-morrow, or at some remote period of time by facts resting only in the memory of individuals."

In contrast with these sound doctrines, compare the mischiefs flowing from the series of decisions of the Illinois supreme court, holding a printed statute of the state, that had been solemnly certified and signed by the presiding officer of each house and approved by the governor, and filed and published as law, to be void, because the legislative journals did not show all constitutional requirements to have been had in its passage, and consequently, that municipal bonds, issued in conformity with the published statute, were void in the hands of innocent holders, who thereby suffered irreparable loss in trusting to a published statute of the state.

Moreover, the supreme court of the United States was compelled to sustain these decisions because they treated entirely of state questions of which the decision of the state court was conclusive. *Post* v. *Supervisors*, 105 U. S. 667, and cases there cited.

In the case at bar, the act in question is found in the secretary's office, the archive of the state. Upon it is indorsed the certificate of the presiding officer of each house of the legislature, under date of March 17, showing that the bill having had three several readings in the house and two several readings in the senate passed that day to be enacted. Upon it is also indorsed a certificate of the secretary of the senate of the same date. "Returned to the senate by the governor. Signature refused. Failed of a passage over his veto."

This act with the indorsements upon it is a record of the highest order, and, under the doctrines above declared, is absolutely conclusive, unless upon its face it bears its own "death wound."

An inspection of the act discovers above the certificate of the secretary of the senate and under the certificates of the presiding officers of both houses the words, "Approved, March 16, 1887," and the signature of the governor with a heavy line in ink drawn through the March 16 and the name of the governor.

This supposed infirmity may explain itself, for the date of the supposed approval appears to have been the day before the bill passed either house of the legislature to be enacted, as if the bill by mischance had been prematurely sent to and by mistake signed by the governor, who, upon discovering the error, corrected the same by making the erasure and returning the bill to the legislature to be put upon its final passage.

But however this may be, accompanying the original act is found the veto message of the governor, under date of March 17, that had been returned with the act to the senate, with his objections as required by the constitution. This is also a record of high order, and most completely cures the supposed irregularity shown upon the face of the act, and is conclusive evidence that the same was returned to the senate without executive approval. No act of the legislature can become a statute when the governor withholds his approval and seasonably returns the same to the proper house with his objections. This act was returned to the proper branch of the legislature on the same day of its passage by the governor with his veto. That was a deliberate act, solemnly done, by the chief executive of our state, and has passed into a record so complete and conclusive, that no evidence of a lower grade can be permitted to overthrow it. He alone was trusted by our people to wield the veto power; and his own solemn declaration of the exercise of that power, within constitutional limits, is as conclusive upon the judiciary, a co-ordinate branch of the government, as the certificates of the presiding officers of the senate and house are conclusive of the passage of an act therein.

The signature of the governor to an act of the legislature is conclusive evidence of executive approval against every one but

himself. He alone should be permitted to dispute it, and only then, while he holds control of the act, and before he shall have deposited the same in the archives of the state; for then it becomes operative, as expressing the legislative will in the form of a statute. *People* vs. *Hatch*, 19 Ill. 283. It has then passed under the control of a constitutional officer whose duty is to "carefully keep and preserve" it. He is neither required to enroll it, by copying it upon a book of records, nor to enter its receipt upon a special book kept in his office for that purpose; and whatever books of that sort he does keep for his own convenience and to aid in the proper dispatch of business are simple remembrances, of no more probative force than other parol evidences of equal credit.

The relator seeks to overturn the solemn record that stands against him, by the testimony of the governor's private secretary and other witnesses, (the governor being dead,) whose evidence is supposed to show that the governor approved the act by signing it and leaving it upon his table in the executive chamber to be taken to the secretary's office, in the usual course of business, where it was taken during the governor's absence at dinner, but who, upon his return, immediately called for the act, and on the same day returned it to the senate with his veto.

Had the act been deliberately deposited in the secretary's office by the governor, it is not to be presumed that the secretary of state would have surrendered it and allowed it to have been taken from his custody. On the other hand, if by mistake it was left in his office without authority from the governor, it could hardly be considered as the deposit of a document in his custody, and therefore did not become the record of a statute that if lost or destroyed could be declared by the court from its judicial knowledge as an existing law, under the doctrine of the case of *The Prince*, 8 Coke, 28. There it is said: "For God defend, if the record of such acts shall be lost, or burnt by fire or other means, that the same shall be to the general prejudice of the commonwealth; but although it be lost or burnt, the judges, by printing or by the record in which it is pleaded, or by other means, may inform themselves of it."

The act in question has been neither lost nor destroyed, but is

now a solemn record in the secretary's office showing that it never became a statute; and the parol testimony relied upon to establish a lost or destroyed record is incompetent, inasmuch as in seeking to set up a lost record it flatly contradicts an existing one.

The cases relied upon by the relator do not controvert our view of the law, but rather confirm it.

The first case cited upon this point shows that the governor had signed an act of the legislature and deliberately deposited it in the state archives as an approved act, and thereafterwards, without withdrawing the act from the custody of the secretary of state, sent a veto message to the legislature stating that he had approved the act, but objecting to some of its provisions. Of course, the veto came too late. The record was conclusive. *State* v. *Whisner*, 35 Kan. 271.

The second case cited shows that the legislature had passed an act and sent it to the governor for his approval, but, before he acted, recalled it by a joint resolution, and he thereupon returned it without approval or disapproval; and the court held that it became a law without executive approval. All these facts appeared by the records of the legislature. *Wolfe* v. *McCaull*, 76 Va. 876.

The third case cited shows that the president had approved an act of congress, that took effect upon its passage, without affixing the year; and the supreme court declared the date of its passage. The original record was imperfect, and the judges sought information from the journals of congress, the records of the department of state, and the message of the president to congress stating the date of his approval of the act. All the best evidence in existence, used to supplement an imperfect record, not to contradict and destroy one. *Gardner* v. *The Collector*, 6 Wall, 499.

And so it is with all the other cases cited by the relator, except the Illinois bond cases before referred to, and a series of decisions in New York relating to what is known as "two thirds bills," where the court allowed the journals of the legislature to overcome the certificates of the presiding officers of the two houses, as showing that these bills, appropriating money for local or private purposes, did not pass each house by a two-thirds vote as required

by the constitution. But in these cases, so far as the reports of them show, the certificates did not state the passage of the bills by a two-thirds vote, but only that they passed, &c., so that these cases may not be regarded as authorities against the doctrine here laid down. *People* v. *Allen*, 42 N. Y. 378. *People* v. *The Commissioners*, 54 N. Y. 276. *People* v. *Petrea*, 92 N. Y. 128.

The opinion of the justices in New Hampshire touching the bank cashiers' act seems to hold to the same doctrine of the Illinois bond cases; but it is to be remembered that the opinion was given without the aid of arguments at the bar, and, therefore, is of less weight than a decision considered in the light of solemn argument. 35 N. H. 579.

*Writ denied.*

PETERS, C. J., WALTON, DANFORTH, VIRGIN and EMERY, JJ., concurred.