STATE OF WEST VIRGINIA *ex rel.* HAROLD P. ARMBRECHT, *et al.*

*v.*

GRIER THORNBURG, *et al.*

(No. 10472)

Submitted March 6, 1951. Decided March 11, 1952.

*Thomas P. O'Brien,* Prosecuting Attorney, *W. F. Keefer,* Assistant Prosecuting Attorney, for plaintiffs in error.

*Charles F. Paul, C. Lee Spillers, Charles McCamic, Wright Hugus* and *Joseph R. Curl,* for defendants in error.

GIVEN, JUDGE:

The State of West Virginia, at the relation of Harold P. Armbrecht and Charles L. Ihlenfeld, filed a petition in the Circuit Court of Ohio County against Grier Thornburg, August W. Petroplus and W. H. Havercamp, ballot commissioners of Ohio County, praying a peremptory writ of mandamus commanding the defendants "to indicate upon the Official Primary Ballots of Ohio County, West Virginia, that each voter is entitled to vote for four members of the House of Delegates of Ohio County," at the May, 1952, primary election to be held in that county. A Rule was duly issued and, upon the hearing of the matters arising on the petition, the Circuit Court of Ohio County awarded a peremptory writ as prayed for, holding, in effect, that Chapter 166 of the 1951 Acts of the Legislature was unconstitutional. The act apportioned unto Ohio County three delegates. Under the prior reapportionment act Ohio County was entitled to four delegates. This Court granted a writ of error.

It is contended that the act is unconstitutional for three

reasons: (1) That the act was passed after the Legislature had been in session sixty days, in violation of Section 22 of Article VI of the State Constitution; (2) that the act disregarded constitutional provisions of Section 6 of Article VI of the State Constitution in that it apportioned one delegate to certain counties not having three-fifths of a delegate population ratio; and (3) that the official census of 1950 had not been completed at the time of the passage of the act.

Section 22 of Article VI of the Constitution, as last amended, limits the period of time a regular session of the Legislature may continue to a maximum of sixty days, unless extended by a vote of two-thirds of the members of each house. The section reads: "All sessions of the Legislature, other than extraordinary sessions, shall continue for a period of sixty days from the date of beginning. But all regular sessions may be extended by the concurrence of two-thirds of the members elected to each house." The 1951 Legislature convened on the tenth day of January. The sixty day period fixed as a maximum length of time for the continuance of the session by Section 22 of Article VI ended at midnight March tenth. The contention is made that House Bill No. 30, which became Chapter 166 of the Acts of 1951, was not finally passed by the Senate until after midnight, March tenth, and that the clock by which the Senate was operating had been purposely stopped sometime before midnight of March tenth. In support of this contention petitioners in the trial court offered evidence of three witnesses, a member of the Senate and two members of the House of Delegates. This extrinsic evidence, if it can be considered by the Court, would establish that House Bill No. 30 was passed by the Senate after midnight of March tenth, 1951. It is the position of the ballot commissioners that such evidence is not admissible for the purpose of impeaching an enrolled bill, or the journal records of the Senate and House of Delegates.

The bill in question passed the House of Delegates on the seventh day of March. It was received by the Senate

in due course and, after passage by that body, was sent to the Governor, who approved it. The Clerk of the Senate has certified that the bill was duly passed on the tenth day of March, or within the sixty day period. The Clerks of each house have certified, in effect, that the session ended on March tenth, 1951. The act has been included in the printed acts of the 1951 Legislature as Chapter 166. The bill, therefore, reaches the Court as an enrolled bill, and nothing appears on the face thereof indicating any possible irregularity in the consideration or passage thereof.

Many decisions will be found to the effect that the courts will not look beyond the enrolling of a bill to determine its constitutionality; that it will be conclusively presumed to have been regularly passed by the Legislature when proper authentication appears on the face thereof. See *Western Union Telegraph Company* v. *Taggart,* 141 Ind. 281, 40 N. E. 1051, 60 L. R. A. 671; *Territory* v. *Clayton,* 5 Utah 598, 18 P. 628; *Morrow* v. *Henneford,* 182 Wash. 625, 47 P. 2d 1016; *Woolfolk* v. *Albrecht,* 22 N. D. 36, 133 N. W. 310; *Atchison, Topeka & Sante Fe Railway Co.* v. *State of Oklahoma,* 28 Okla. 94, 113 P. 921, 40 L. R. A. (N. S.) 1; *Field* v. *Clark,* 143 U. S. 649, 12 S. Ct. 495, 36 L. ed. 294. What we believe to be the weight of authority, however, is that the courts may look to the journals of the Legislature and to other public records, but not to extrinsic evidence, to determine whether an act has been passed in accordance with constitutional requirements. See *Wise* v. *Bigger,* 79 Va. 269; *Jackson* v. *State,* 131 Ala. 21, 31 So. 380; *Andrews* v. *People,* 33 Colo. 193, 79 P. 1031; *Koehler* v. *Hill,* 60 Iowa 543, 15 N. W. 609; *Attorney General* v. *Rice,* 64 Mich. 385, 31 N. W. 203; *State ex rel. McKinley* v. *Martin,* 160 Ala. 181, 48 So. 846; *White* v. *Hinton,* 3 Wyoming 753, 30 P. 953; *Weeks* v. *Smith,* 81 Me. 538, 18 Atl. 325; *State ex rel. Hesson* v. *Smith,* 44 Ohio St. 348, 7 N. E. 447; *Homrighausen* v. *Knoche,* 58 Kansas 817, 50 P. 879; *Integration of Bar Case,* 244 Wis. 8, 11 N. W. 2d 604; *State ex rel. Cline* v. *Schricker,* 228 Ind. 41, 88 N. E. 2d 746. In the opinion in the case last cited a statement

is found which illustrates the reasoning of the courts so holding, which reads:

"It has been the consistent position of this court that the evils attending uncertainty in ascertaining the statutory laws of the state would far out-weigh any benefits which might be obtained by permitting an impeachment of the authentication of an act. If the members of the General Assembly violate their constitutional duties on adjournment, they can be defeated the next time such offices come up for election, but the remedy is not with the courts.

" ' . . . Public authority and political power must, of necessity, be confided to officers, who, being human, may violate the trusts reposed in them. This perhaps cannot be avoided absolutely. But it applies also to all human agencies. It is not fit that the judiciary should claim for itself a purity beyond others; nor has it been able at all times with truth to say that its high places have not been disgraced. The framers of our government have not constituted it with faculties to supervise co-ordinate departments and correct or prevent abuses of their authority. It cannot authenticate a statute; that power does not belong to it; nor can it keep the legislative journal. It ascertains the statute law by looking at its authentication, and then its function is merely to expound and administer it. It cannot, we think, look beyond that authentication, because of the constitution itself. If it may, then for the same reason it may go beyond the journal, when that is impeached; and so the validity of legislation may be made to depend upon the memory of witnesses, and no man can, in fact, know the law, which he is bound to obey. Such consequences would be a large price to pay for immunity from the possible abuse of authority by the high officers who are, as we think, charged with the duty of certifying to the public the fact that a statute has been enacted by competent houses. Human governments must repose confidence in officers. It may be abused, and there may be no remedy.' *Evans, Auditor* v. *Browne* (1869), 30 Ind. 514, 526. See also Wigmore, *Evidence* (3rd Ed.) §1350."

The question appears to have been first discussed by this Court in *Lusher* v. *Scites,* 4 W. Va. 11. Some of the language contained in the opinion in that case may possibly be construed to the effect that an enrolled bill is conclusively presumed to have been regularly passed by the legislative body. In *Osburn* v. *Staley,* 5 W. Va. 85, 13 Am. Rep. 640, however, the Court held, syllabus, Points 3 and 4, as follows:

"3. The constitution of West Virginia requires each branch of the legislature to keep a journal, and provides that on the passage of every bill the vote shall be taken by yeas and nays, and be entered on the journal, and no bill shall be passed by either branch without an affirmative vote of a majority of the members elected thereto; and on a question touching the validity of an act, this court can look beyond the authentication of the act, to the journal of either branch, to see if the bill passed by the required number of votes."

"4. While the legislature is governed by the *spirit* of the constitution, the courts cannot declare an act of the legislature invalid unless its invalidity is placed beyond a reasonable doubt. A reasonable doubt must be solved in favor of the legislative action, and the act be sustained. The courts must be guided by the express words of the constitution, and not by its supposed spirit. Whenever an act of the legislature can be so construed as to avoid conflict with the constitution and give it force of law, such construction will be adopted by the courts."

In *Price* v. *Moundsville,* 43 W. Va. 523, 27 S. E. 218, 64 Am. St. Rep. 878, the Court held, syllabus, Point 3, that "A mere clerical omission in the journal of either house will not vitiate an act of the legislature, if there is sufficient on the face of the journal to show substantial compliance with constitutional requirements."

In *Capito* v. *Topping,* 65 W. Va. 587, 64 S. E. 845, 22 L. R. A. (N. S.) 1089, the legislative journals showed that the Legislature adjourned on February 26, 1909. Affidavits showed, however, that the adjournment was February 27,

1909, at 6:40 A. M. Certain bills were disapproved by the Governor, but were not returned to the office of the Secretary of State within five days after February 26, but were returned to that office within five days after February 27. If the correct date of adjournment was February 26, the bills became law notwithstanding the Governor's disapproval. Therefore, the question for determination was whether the Legislature actually adjourned on February 26 or February 27. The Court found that the Legislature adjourned on the 26th of February, and that the bills became law, notwithstanding the Governor's disapproval, and held, syllabus, Point 7, that "When the records of the legislature show the time of adjournment and are clear and unambiguous, respecting the same, they are conclusive; and extraneous evidence cannot be admitted to show a different date of adjournment." The holding clearly implies that where the legislative records are ambiguous as to whether constitutional requirements in the consideration or passage of a bill by the Legislature have been complied with, extrinsic evidence may be admitted showing failure on the part of the Legislature to comply with such requirements.

In *Anderson* v. *Bowen,* 78 W. Va. 559, 89 S. E. 677, the contention against the constitutionality of the bill was that it had not been read on three separate days in each branch of the Legislature, as required by Section 29, Article VI, of the Constitution. There was no question that the bill passed the House regularly. The journal of the Senate specifically showed a first and third reading. Certain members made statements, included in the journal of the Senate, to the effect that the bill had not been read the second time, and a statement of the presiding officer was to the effect that the bill had been read the second time. In sustaining the constitutionality of the act the Court held, syllabus, Point 1, that "A bill duly enrolled, authenticated and approved is presumed to have been passed by the legislature in conformity with the requirements of the constitution, unless the contrary is made to appear affirmatively; and the proof of omissions of con-

stitutional requirements, furnished by the journals of the two houses, in matters of procedure, must be clear and conclusive, to overcome such presumption."

In *Combs* v. *Bluefield*, 97 W. Va. 395, 125 S. E. 239, the enrolled bill differed essentially from the official copy thereof as printed in the Acts of the Legislature. The Court gave the enrolled bill controlling weight, holding, syllabus, Point 2, that "When an enrolled bill differs from the official published copy, the enrolled bill is the best evidence of the intent of the legislature."

In *Bank* v. *Fox*, 119 W. Va. 438, 194 S. E. 4, there was a variance between the enrolled bill and the printed act. The Court held, syllabus, Point 1, that "The printed acts of the Legislature are presumed to be valid enactments. Where, however, there is a variance between a printed act and the enrolled bill, the enrolled bill controls. The strongest presumption, however, is in favor of a bill which has been duly enrolled and bears thereon evidence of the executive's action in regard to it. Nevertheless, an authenticated enrolled bill is not a verity precluding question, and the presumption in its favor may be overcome by clear and convincing proof."

From these decisions it clearly appears, we believe, that this Court early adopted, and has continuously followed, a rule permitting the Court, in determining whether the Legislature has complied with the constitutional requirements in the consideration or passage of a bill, to look to the journals and to other official records and, in the event of patent ambiguity in such records, to hear and determine the question of the constitutionality of the act by aid of extrinsic evidence.

Petitioners contend that such ambiguity exists in the records here involved, and base their contention upon certain statements found in the journal of the Senate. The journal shows that the Senate convened on March 10, 1951, at 10:00 A. M. House Bill No. 30 was brought "up in regular order" for third reading, the hour not shown, but "On motion of Mr. Bean, further consideration of the bill

was postponed until 2 P. M.". The bill again "On third reading, came up in regular order", the exact hour not shown, but "On motion of Mr. Bean, further consideration of the bill was postponed until 8:30 P. M." Later, pursuant to the postponement of further consideration of the bill to 8:30 P. M., the bill "On third reading, coming up in regular order, was read a third time and passed with its title." The exact hour of the passage of the bill is not specifically indicated in the journal. Since, however, the postponement of the bill was until 8:30 P. M. of March 10, this Court must assume, inasmuch as the bill came "up in regular order", that it was passed at that time. To this point in the legislative procedure there appears no uncertainty or ambiguity whatever. The Senate Journal clearly shows that the bill passed that body on the tenth of March, 1951, within the sixty day period. Except as hereinafter noted, nothing appears in the records of which this Court takes judicial notice indicating any uncertainty as to the time of the passage of the bill.

It is contended that certain statements contained in the Senate Journal established that the bill was passed by the Senate after midnight of March 10, and that such statements constituted the journal record, relating to the time of the passage of the bill, ambiguous. Such statements are contained in the following excerpt taken from the journal, beginning on page 1095:

"MR. HOLDEN: Mr. President, I would like to recommend that Eng. House Bill No. 30 be taken up again and be voted on—reconsideration of Eng. House Bill No. 30.

"MR. PRESIDENT: Do you move that we reconsider the vote by which we passed Eng. House Bill No. 30?

"MR. HOLDEN: To reconsider Eng. House Bill No. 30.

"MR. AMOS: Mr. President, it isn't in regular order.

"THE PRESIDENT: The regular order has been demanded.

"MR. EDDY: What is the regular order?

"THE PRESIDENT: We were on the passage of bills, Senator. That was the seventh order.

"MR. EDDY: I then move that we return to the third order of business for the purpose of making a motion.

"MR. PRESIDENT: The Senator from Monongalia—

"MR. AMOS: Mr. President, I move that we recess for ten minutes.

"MR. EDDY: I move we return to the fifth order of business.

"MR. AMOS: Mr. President, I again demand the regular order.

"MR. PRESIDENT: The motion is to recess for ten minutes.

"MR. EDDY: I appeal from the ruling of the Chair.

"MR. PRESIDENT: It may be granted.

"MR. BEAN: Mr. President, what is the motion pending?

"MR. PRESIDENT: The regular order is demanded. The rules of the Senate provide the order of business by which the Senate shall operate, and are set forth in rules one to nine. The time for motions is on the fifth order of business. We were down to the fourth order of business at that point, instead of the seventh.

"MR. BEAN: Mr. President, it seems to me that the fifth order of business would come next, and I withdraw my motion to recess.

"MR. EDDY: The next order would be to receive bills, resolutions, motions and petitions. Does the Chair rule otherwise?

"MR. AMOS: Mr. President, we have finished the special calendar, have we not?

"MR. PRESIDENT: That is correct, Senator.

"MR. AMOS: Any matter to be taken up at this time would be by unanimous consent of the members, or a vote would be necessary in order to change a rule of the Senate.

"MR. PRESIDENT: I might suggest, Senator, we are still operating under the tenth of March. The motion was to recess for ten minutes.

"MR. EDDY: For the record, then, I desire to call attention in the Journal—and have someone move that my remarks be put in the Journal—that it is now twenty minutes after eight, on March eleventh, one thousand nine hundred fifty-one, and that when Eng. House Bill No. 30 was considered in this body approximately an hour ago, it was then twenty minutes after seven, on March eleventh, one thousand nine hundred fifty-one.

"MR. CARRIGAN: I move that the remarks of the Senator from Monongalia be put in the Journal.

"MR. PRESIDENT: Those in favor signify by saying 'Aye', those opposed 'No.' The Chair is in doubt. Division.

"MR. EDDY: What do you mean by division?

"The PRESIDENT: Senator, if I may suggest, what we propose to do is to carry this over on a recess of ten minutes and return to it at eleven o'clock this same day.

"MR. EDDY: I am perfectly willing to do that if the motion to reconsider can be considered.

"THE PRESIDENT: It can be done, at least, at the end of the ten-minute recess.

"MR. EDDY: I don't see how a ten-minute recess would have anything to do with the order of business we are now in.

"THE PRESIDENT: Senator, we have run the calendar. In addition, a motion to recess has priority. You can, of course, take a vote on the appeal if you wish. That is perfectly satisfactory with me.

"MR. EDDY: Let's have a division on putting the remarks in the Journal.

"Whereupon, the division was taken and the President announced the vote of 14 'yeas' and 11 'nays.'

"On motion of Mr. Bean, the Senate recessed for five minutes.

"The Senate met at the expiration of the recess.

"Mr. Bowers moved that the Senate reconsider its action by which it had this day passed.

"Eng. House Bill No. 30—'A Bill to amend and reenact section two, article two, chapter one of the code of West Virginia, one thousand nine hundred thirty-one, as last amended by chapter fifty-three, acts of the Legislature, second extraordinary session, one thousand nine hundred thirty-three, relating to apportionment of membership of the House of Delegates.'

"And, on this motion, demanded a division.

"The demand being sustained, the vote was taken and a majority of those present and voting, not having voted in the affirmative, the motion did not prevail."

The statements quoted do not disclose any ambiguity in the records as to the time of the passage of the act. The statement of Senator Eddy "that it is now twenty minutes after eight, on March eleventh, one thousand nine hundred fifty-one, and that when Eng. House Bill No. 30 was considered in this body approximately an hour ago, it was then twenty minutes after seven, on March eleventh, one thousand nine hundred fifty-one.", does not necessarily refer to the time of the passage of the act. It refers, in fact, to the motion of Senator Holden to "reconsider" the act sometime after the passage thereof. This is made clear by the later remark of Senator Eddy that "I am perfectly willing to do that if the motion to reconsider can be considered." Moreover, we can not assume that the Senator intended to use the word "considered" as being synonymous with the word "passed".

We are not here called upon to decide whether the quoted statements of Senator Eddy, assuming such statements to have clearly referred to the "passage" rather than to the "reconsideration" of the bill, would be of sufficient purport to overcome the strong presumption existing in favor of the validity of an enrolled bill. We merely hold that the statements do not constitute such an ambiguity or conflict in the public records as to permit the Court to consider extrinsic evidence relating thereto. See, however, *Anderson* v. *Bowen, supra,* where the Court held, syllabus, Point 2, that "Though the journal of one of the houses does not show a bill was read a second time and does show members protested that it had not been, the fact may be inferred from a declaration of the presiding officer that it had been, amendments made, advancement to third reading and recital of a third reading, all affirmatively disclosed by the journal." See also *Capito* v. *Topping, supra; Weiss* v. *Stubblefield,* 85 Kansas 199, 116 P. 205; *Auditor General* v. *Board,* 89 Mich. 552, 51 N. W. 483.

While this Court must accord to the Legislature, a co-ordinate branch of the government, every constitutional power or right possessed by it, the fact must not be overlooked that the Court is charged with the solemn duty of determining what acts of the Legislature are constitutional, and what acts have been passed by the Legislature in conformity with the demands of the Constitution, when such questions are properly presented to the Court. The mere stopping of a clock does not stop the passing of time. The sixty day provision of the Constitution does not prevent the Legislature, by "a concurrence of two-thirds of the members elected to each house", from extending a session beyond sixty days, if necessity therefor exists. The method so provided for an extension of the session by the Constitution appears ample but, if not ample, we are not warranted in avoiding the direct and certain command of the Constitution by any sort of subterfuge, and we do not hesitate to say that this Court, at least as now constituted, would adjudge any legislation invalid if it be

established by a proper showing to have been enacted beyond the sixty day period, where no constitutional extension is shown to have been authorized.

The next contention to be considered is that the apportionment act of 1951 disregards provisions of Section 6, Article VI of the State Constitution, in that it apportions one delegate to certain counties not having a delegate population ratio. Section 6 reads: "For the election of Delegates, every county containing a population of less than three-fifths of the ratio of representation for the House of Delegates, shall, at each apportionment, be attached to some contiguous county or counties, to form a Delegate District." Section 7 of Article VI of the Constitution reads: "After every census the Delegates shall be apportioned as follows: The ratio of representation for the House of Delegates shall be ascertained by dividing the whole population of the State by the number of which the House is to consist and rejecting the fraction of a unit, if any, resulting from such division. Dividing the population of every Delegate District, and of every county not included in a Delegate District, by the ratio thus ascertained, there shall be assigned to each a number of Delegates equal to the quotient obtained by this division, excluding the fractional remainder. The additional Delegates necessary to make up the number of which the House is to consist, shall then be assigned to those Delegate Districts, and counties not included in a Delegate District, which would otherwise have the largest fractions unrepresented; but every Delegate District and county not included in a Delegate District, shall be entitled to at least one Delegate." According to the allegations of the petition, the 1951 apportionment act apportioned unto each county at least one delegate. Some of the counties apportioned one delegate had a population of less than three-fifths of the delegate population ratio. From these facts it is contended that the apportionment act is discriminatory and unconstitutional.

What has been said as to the strong presumption exist-

ing in favor of an enrolled bill, especially where clearly supported by the legislative records, largely applies to the present contention. We must assume that the Legislature made a finding as to all necessary facts warranting the enactment of the legislation, including the population of each county. There is nothing in the record of this proceeding which we consider in conflict with that presumption. In such case this Court will not consider the propriety or correctness of a finding of fact upon which the Legislature bases an act. In *Lusher* v. *Scites,* 4 W. Va. 11, the Court held, syllabus, Point 2, that "The courts cannot go into an inquiry as to the truth or falsity of facts upon which an act of the legislature is predicated, where the latter has sole jurisdiction of the subject." In *Glover* v. *Sims,* 121 W. Va. 407, 3 S. E. 2d 612, the Court held, syllabus, Point 1, that "A legislative declaration of fact should be accepted by the courts unless there is strong reason for rejecting it." Moreover, it appears that beginning with the apportionment act of 1901, each county within the State has been apportioned at least one delegate, whether or not such county contained the proper delegate population ratio. Whether this long practice results from actual findings of fact by the Legislature, whether it resulted from a legislative interpretation of what appears to be a possible conflict between provisions of Sections 6 and 7 of Article VI, or whether the provisions of Section 6 were intended to apply only to delegate representation prior to the taking of the first census after the adoption of the Constitution, we need not say. In the more than fifty years such legislation has been in effect, no question has been raised as to its validity. In *Adams* v. *Bosworth,* 126 Ky. 61, 102 S. W. 861, the Court held: "The apportionment of the state into senatorial districts under Act June 28, 1893 (Laws 1893, p. 1204, c. 235), having been accepted for 13 years without its validity being questioned, the constitutionality of the act may not be questioned on the ground that the act infringes Const. §6, providing that 'all elections shall be free and equal,' and section 31, requiring an apportionment as nearly equal as may be of senatorial districts." See *Donovan* v. *Suffolk County Ap-*

*portionment Commissioners,* 225 Mass. 55, 113 N. E. 740, Annotation 2 A. L. R. 1334.

Neither is there merit in the contention that the official census of 1950 had not been completed at the time of the enactment of the legislation. Again we must assume that the Legislature had before it proper facts upon which to base its findings. Nothing in the legislative records, or other records of which we take judicial notice, indicates otherwise.

Holding, as we do, the apportionment act of 1951, Chapter 166 of the Acts of the Legislature, 1951, is constitutional and valid, the judgment of the Circuit Court of Ohio County is reversed, the case remanded to that court, with directions to discharge the peremptory writ of mandamus heretofore awarded, and to dismiss the proceeding.

*Reversed and remanded.*